## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

FILED
iN CLERKS OFFICE

2012 APR 23 ⊃ 2: 12

U.S DISTRICT COURT
DISTRICT OF MASS.

AARON POWELL,

Plaintiff

V.

Civil Action No. _____

ANDREA CABRAL,
Sheriff, South Bay House of Correction,

Respondent

## PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

### Introduction:

The Supreme Judicial Court has criminally banned all firearms possession in Massachusetts despite the clear, controlling law of District of Columbia v. Heller, 554 U.S. 570, 592 (2008) and McDonald v. City of Chicago, 130 S. Ct. 3020, 3046 (2010). It has done so in the Powell decision by relieving the Commonwealth from proving at trial that an individual lacks a license or registration for a firearm. The Court ruled, relying upon Commonwealth v. Jones, 361 N.E.2d 1308, 1311 (Mass. 1977), that it is not the Commonwealth's burden to prove that a person lacks a license in order to prove the crime of possession of an unlicensed firearm. Commonwealth v. Powell, 459 Mass 572, 582 (2011). The Court thereby re-affirmed M.G.L. c. 278 § 7's mandatory presumption that knowing possession of a firearm is a crime and held that the burden rests upon the defendant to produce evidence that

1

a license exists. Powell, 459 Mass. at 582. In re-casting an element of this crime as an exception, the Court did not, even in passing, refer to the United States Supreme Court's landmark jurisprudence regarding elements, the proper allocation of burdens and the presumption of innocence. See Apprendi v. New Jersey, 530 U.S. 466 (2000), Tot v. United States, 319 U.S. 463 (1943) and United States v. Romano, 382 U.S. 136 (1965). The Court also did not acknowledge the fact that individuals have the fundamental right to keep and bear arms and thus, the exercise of that right constitutes presumptively innocent conduct. Heller, 554 U.S. at 592 (finding the Second Amendment codified a "pre-existing right" that "shall not be infringed") and McDonald, 130 S. Ct. at 3046 (rejecting the invitation to "allow state and local governments to enact any gun control law that they deem to be reasonable, including a complete ban on the possession of handguns in the home for self-defense."). M.G.L. c. 278 § 7 is thus unconstitutional because it imposes a presumption of guilt upon individuals who knowingly possess an operable firearm. This Court should apply de novo review to both his due process and Second Amendment claims underlying these two related grounds for relief.

The Supreme Judicial Court failed to recognize the unconstitutional burden shift to the defendant on the licensing element. As a result of this failure, it found no prejudice by trial counsel's failure to file a motion to suppress Powell's statements to the police. Skipping over the ineffective assistance prong, it reasoned that Powell's statement that he did not have a firearm, without any evidence of a prior Miranda warning, did not prejudice him because "it was not the

2

Commonwealth's burden to prove that the defendant did not have a firearms license." Powell, 459 Mass. at 583. Therefore, because this claim necessarily hinges upon whether absence of a license is an element of this crime, this Court should apply de novo review for his ineffective assistance of counsel claim.

M.G.L. c. 269 § 10 and M.G.L. c. 140 § 131 are unconstitutional on their face and as applied because they ban law-abiding eighteen-year old adults from possessing or carrying a handgun in violation of the right to keep and bear arms under the Second Amendment and the Equal Protection Clause of the Fourteenth Amendment. The Supreme Judicial Court did not adjudicate these substantive claims on their merits and thus there is nothing to which this Court should defer. De novo review should also be applied to the Supreme Judicial Court's holding that Powell lacked standing to mount his Second Amendment and Equal Protection claims. This holding relies upon *no* federal or even Massachusetts cases or rules. It is also clearly contrary to governing Supreme Court law, which grants Article III standing to individuals similarly situated to Powell.

## Procedural History:

On August 21, 2008, Aaron Powell was charged by complaint in the Boston Municipal Court with one count of Carrying a Firearm Without a License, in violation of Mass. Gen. Laws Ch. ("M.G.L. c.") 269 § 10(h)[1], one count of a weapon charge as aforesaid loaded weapon, in violation of M.G.L. c. 269 § 10(n), one count of

---

[1] The petitioner has attached the relevant statutory and constitutional provisions as Appendix A. He has also attached the *Powell* decision as Appendix B. Finally, he has attached his criminal complaint and criminal dockets as Appendix C.

3

Possession of Firearm without a Firearms Identification (FID) Card, in violation of M.G.L. c. 269 § 10(h), one count of Resisting Arrest, in violation of M.G.L. c. 268 § 32B, and one count of Assault and Battery on a Police Officer, in violation of M.G.L. c. 265 § 13D. The assault and battery on a police officer count was dismissed at the Commonwealth's request before trial. On November 3, 2008, a suppression hearing was held in the Boston Municipal Court. The court denied the motion to suppress. On January 30, 2009, the case was tried before a judge (Coyne, J. presiding). The court denied Powell's motion for required findings on all charges. The court then found Powell guilty of all charges. The court sentenced Powell to six months in the House of Corrections on the resisting arrest count to run concurrent with an eighteen month sentence on the possession of an unlicensed firearm, loaded weapon and firearm/ammunition without an FID card counts. It also ordered a term of probation for three years on and after this sentence. Powell filed a timely notice of appeal. The Roxbury Division of the Boston Municipal Court later found on September 30, 2011 that Powell violated the terms of his probation. He is currently serving a two year sentence (with 50 days credit) at South Bay House of Correction.

Powell's appeal was entered in the Massachusetts Appeals Court on May 20, 2009. After briefing, it was argued in that Court on May 12, 2010. App. 19-21a. After oral argument, the Supreme Court issued McDonald v. City of Chicago, 130 S.Ct. 3020 (2010). Pursuant to that decision, Powell filed a supplemental memorandum of law, which the Appeals Court allowed for filing on July 26, 2010. The Commonwealth later filed its Supplemental Memorandum of Law and Powell

4

thereafter filed his Reply. On August 24, 2010, the Supreme Judicial Court took Powell's appeal *sua sponte* and all materials, including his supplemental memoranda, were forwarded to the Court. His appeal was argued again in that Court on October 7, 2010. Powell also filed various supplemental letters including one in reply to an amicus brief submitted by the Hampden County District Attorney's Office and filed at the request of the Court post-argument.

The Supreme Judicial Court issued its opinion on April 28, 2011. The Court affirmed Powell's convictions. Commonwealth v. Powell, 459 Mass. at 583-591. First, it adopted its holding from Commonwealth v. Jones, 372 Mass. 403 (1977) that absence of a license or registration is not an element of the crime of possession of an unlicensed or unregistered firearm. Powell, 459 Mass. at 582. Thus, the Commonwealth need not offer evidence on the issue. Id. It then re-affirmed Jones' conclusion that the burden is on the defendant to present evidence of the existence of a license. Id. Citing only state cases, primarily Jones, in support of this holding, the Court rejected Powell's claim under the Fourteenth Amendment that the Commonwealth presented insufficient evidence on an essential element of the crime. Id. The Court did not address Powell's claim that defining the crime as simple possession of a firearm, without more, violates the Second Amendment right to keep and bear arms.

Second, the Court rejected Powell's related claim that trial counsel was ineffective for failing to file a motion to suppress his statement to a police officer that he did not have a firearm. It found that the admission of this statement did not

5

prejudice him since it was not the Commonwealth's burden to prove absence of license. Id. at 583.

Third, the Court rejected Powell's Second Amendment and Equal Protection Clause claims. Although trial counsel did not file a pre-trial motion to dismiss, the Court considered these claims preserved: "Because the Second Amendment issue now presented by the defendant was not available to him until after *McDonald* [*v. City of Chicago*] was decided, which was long after his trial, we conclude that his failure to raise the issue during his trial does not preclude him from raising it here." Powell, 459 Mass. at 586-587. In rejecting his Second Amendment claim, the Court gave a general overview of the Heller and McDonald decisions without specifically applying them to Powell's claims. Id. at 584-586. The Court then held that Powell lacked standing to bring these claims because he did not obtain or attempt to obtain a registration card or license for the firearm. Id. at 590. The Court reasoned as follows: "Instead of applying for an FID card, the defendant chose to violate the law. In these circumstances, we conclude that he may not challenge his conviction under G.L. c. 269, § 10 (*h*) (1)." Id. at 589-590. With respect to the license to carry, the Court similarly reasoned: "He chose instead (again) to violate the law. In these circumstances, we conclude that the defendant may not challenge his convictions under G.L. c. 269, § 10 (*a*)." Id. at 590.

Powell timely filed his petition for certiorari in the United States Supreme Court on September 24, 2011, after being granted an extension. He raised the claim that the presumption that he did not have a firearms license or registration card

6

violated his Second Amendment and due process rights. He also raised the claim

that the Second Amendment's protections extend to eighteen-year old adults and

therefore, the firearms statutes' infringement upon their right to possess and carry

ordinary handguns violated the Second Amendment and the Equal Protection

Clause of the Fourteenth Amendment. His petition was denied on March 19, 2012.

### Statement of Facts:

The relevant facts are set forth above, in sections headed "Introduction" and

"Procedural History" as well as the body of his petition for a writ of habeas corpus.

### Standard of Review:

Petitioner seeks federal habeas corpus relief under 28 U.S.C. § 2254. He

submits that the usual deferential review imposed by § 2254(d)(1) as amended by

the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") should not be

applied to his significant constitutional claims. Instead, this Court should review all

grounds in this petition de novo.

### Ground One:

The Supreme Judicial Court engaged in no critical analysis of Powell's due

process claim that shifting the burden to the defendant on the licensing element

was unconstitutional. "We have refused to revisit these conclusions...and find no

reason to do so now." Powell, 459 Mass. at 582. The Court relied upon no federal

constitutional cases to reach its ultimate conclusion. It primarily relied upon Jones

– a thirty-five year old state decision – which does not (and cannot) rely upon the

*presently existing* federal constitutional law on this issue. See Apprendi v. New

7

Jersey, 530 U.S. 466 (2000) and Blakely v. Washington, 542 U.S 296 (2004).

Apprendi provided a crucial explication of In Re Winship's due process guarantee. It held that the legislature cannot re-cast a necessary fact for conviction as a mere "sentencing factor" and that "a 'crime' includes every fact that is by law a basis for imposing or increasing punishment." Apprendi, 530 U.S. at 501. It also fully explained how to define the elements of the crime - an analysis sorely lacking in the Powell decision. Neither Powell nor Jones analyze the effect of the indictment or complaint listing the ingredients or elements of the crime, including the absence of license or registration, while Apprendi discusses this issue at length.

The Court's reliance upon Jones and other state cases[2] should thus be given no deference with respect to this constitutional claim and review should be de novo. Evans v. Thompson, 518 F.3d 1, 6 (1st Cir. 2008). "It is correct that when the state court has addressed the federal constitutional issue, it is its ultimate outcome, and not its rationalization, which is the focus. *See Hurtado v. Tucker,* 245 F.3d 7, 20 (1st Cir.), *cert. denied* 534 U.S. 925, 122 S.Ct. 282, 151 L.Ed.2d 208 (2001). But that does not mean the deferential standard applies where the state court has not addressed the constitutional issue." DiBenedetto v. Hall, 272 F.3d 1, 6-7 (1st Cir. 2001). Nor is AEDPA triggered by the state cases cited in Powell on the grounds that they set forth a more lenient due process standard than the federal standard. See McCambridge v. Hall, 303 F.3d 24, 35 (1st Cir. 2002). "[O]ur treatment of due

[2] The Court also cited to Commonwealth v. Colon, 449 Mass. 207 (2007), which does not address Apprendi or any Supreme Court case on that defendant's due process claim raised in a pro-se brief, and Commonwealth v. Tuitt, 393 Mass. 801 (1985), which briefly disposed of the due process claim by citing to Jones.

8

process challenges to legislation has adhered to the same standards as those applied in Federal due process analysis." Commonwealth v. Ellis, 429 Mass. 362, 371 (1999).

Even at the time of this decision, Jones did not apply the correct federal constitutional standard. By that time, the Supreme Court had discarded the test regarding presumptions under Morrison v. California, 291 U.S. 82 (1934), upon which Jones heavily relied, in favor of a "rational connection" test under Tot v. United States, 319 U.S. 463, 468 (1943) and United States v. Romano, 382 U.S. 136, 139 (1965). Jones mentioned neither case. Therefore, the Supreme Judicial Court failed to apply the correct or current federal constitutional standard and should be granted no deference on this ground.

### Ground Two:

The Supreme Judicial Court completely skipped the merits of his ineffective assistance claim and therefore, there is no res judicata effect triggering deference. See Teti v. Bender, 507 F.3d 50, 56 (1st Cir. 2007). As for the prejudice prong, the Court hinged its finding of no prejudice to its conclusion that the Commonwealth carried no burden to prove that the defendant lacked a license for the firearm. Powell, 459 Mass. at 583. Because its prejudice anlaysis necessarily flowed from its inadequate analysis on Powell's due process claim, the Court should also be afforded no deference on the prejudice prong.

9

**Ground Three:**

The Supreme Judicial entirely failed to address his claim that defining the

crime as simple possession of a firearm, without more, violates the Second

Amendment. This claim was amply raised in his supplemental memoranda

(submitted after the Supreme Court decided <u>McDonald v. City of Chicago</u>) and

supplemental letters, which were accepted by both the Appeals Court and the

Supreme Judicial Court for filing. The Court should have then considered this claim

but did not. Therefore, there is no deference to give on this particular claim. "[I]f

state courts want us to defer to their rulings, they must, at a bare minimum,

address the constitutional issue when properly raised. That is, if they do not

address the constitutional claim, we have nothing to defer to." <u>Watkins v. Murphy</u>,

292 F.3d 70, 75 (1st Cir. 2002).

**Ground Four:**

The Court did not reach the merits of his Second Amendment and Equal

Protection violations claims and therefore, it can be accorded no deference on their

substance. "A matter is 'adjudicated on the merits' if there is a 'decision finally

resolving the parties' claims, with res judicata effect, that is based on the substance

of the claim advanced, rather than on a procedural, or other, ground.'" <u>Teti v.

Bender</u>, 507 F.3d 50, 56 (1st Cir. 2007), quoting <u>Sellan v. Kuhlman</u>, 261 F.3d 303,

311 (2nd Cir. 2001). "After all, AEDPA imposes a requirement of deference to state

court decisions, but we can hardly defer to the state court on an issue that the state

court did not address." <u>Fortini v. Murphy</u>, 257 F.3d 39, 47 (1st Cir. 2001). <u>See also</u>

Leftwich v. Maloney, 532 F.3d 20, 24 (1st Cir. 2008). Instead of adjudicating on the merits, it held that Powell was not permitted to bring these claims before the Court because he lacked standing to do so. Because of this conclusion, it held that "we need not consider his claim that these provisions violate his Federal and State equal protection rights on account of effecting an age disqualification." Powell, 459 Mass. at 590.

Its holding that Powell lacked Article III standing is also due no deference because it cited no federal or even *Massachusetts* cases to reach that conclusion. Instead, it relied upon a footnote in a Maryland case, Williams v. State, 417 Md. 479, 488 n. 7 (2011)[3], which in turn cited only to Maryland cases. Its holding on standing also conflicts with the rest of the Powell decision. On the one hand, the Supreme Judicial Court holds that absence of a license is not an element of the firearms offense. On the other hand, it holds that criminal defendants must apply for a license if they wish to challenge the constitutionality of the firearms statutes. If the former holding is correct, then all criminal defendants have standing to challenge the firearms statutes regardless of whether they applied for licenses

_____

[3] This footnote states in relevant part: "Nevertheless, because Williams failed to file an application for a permit to carry a handgun, he lacks standing to challenge the constitutionality of Sections 5–301 *et* seq. of the Public Safety Article, as well as Title 29, subtitle 3 of the Code of Maryland Regulations. *See, e.g., Gregg v. State,* 409 Md. 698, 704 n. 2, 976 A.2d 999, 1002 n. 2 (2009) (reasoning appellant had standing to file "Petition for DNA Evidence—Post Conviction Review," because he had been convicted of first-degree murder); *Evans v. State,* 396 Md. 256, 328, 914 A.2d 25, 68 (2006) (reasoning that "an individual or an organization 'has no standing in court unless he has also suffered some kind of special damage from such wrong differing in character and kind from that suffered by the general public' ") (citation omitted)." Williams v. State, 417 Md. 479, 488 n. 7 (2011).

under them. If absence of a license is not an element of the firearms offense, then a criminal defendant need not show that he applied for a license in order to challenge the statute on Second Amendment grounds. Finally, this holding is both contrary to Supreme Court law and objectively unreasonable because Powell has clearly met both the injury and the causation-in-fact prongs to merit Article III standing.

The Merits:

### Ground One: No State May Presume A Person, Who Merely Possesses a Firearm, Has No License To Do So, Nor May The State Punish The Person Based Upon That Unconstitutional Presumption.

M.G.L. c. 269 § 10(a)(2) provides that "[w]hoever...knowingly has in his possession...a firearm, loaded or unloaded...without...having in effect a license to carry firearms issued" shall be punished with the crime of possession of an unlicensed firearm. M.G.L. c. 269, § 10(h)(1) prohibits possession of a firearm "without complying with the provisions of section 129C of chapter 140[.]" M.G.L. c. 140, § 129C prohibits such possession "unless he has been issued a firearm identification card." The text of these statutes contemplates that it is the absence of a license or registration that transforms permissible possession of a firearm into criminal possession. Commonwealth v. Young, 453 Mass. 707, 714 (2009) (reasoning that "unlicensed possession of a firearm" is a "regulatory crime."). As a result, the Supreme Judicial Court has held in the suppression context that "[c]arrying a gun is not a crime. Carrying a firearm without a license (or other authorization) is." Commonwealth v. Alvarado, 423 Mass. 266, 269 (1996) (interpreting M.G.L. c. 269, § 10(a)). "The mere possession of a handgun [is] not sufficient to give rise to a

12

reasonable suspicion that the defendant [is] illegally carrying that gun."

Commonwealth v. Couture, 407 Mass. 178, 183 (1990). It has also held that if the

police question a suspect about whether he possesses a firearms license, Miranda

warnings must precede such interrogation since it would elicit a testimonial

communication under the Fifth Amendment. Commonwealth v. Haskell, 438 Mass.

790, 796-797 (2003). Despite these rulings, M.G.L. c. 278, § 7 creates a mandatory

presumption which burdens a defendant to "prove the [existence of a license]; and,

until so proved, the presumption shall be that he is not so authorized." The

Commonwealth paradoxically has the burden of proof at a suppression hearing, but

not at a trial.

A state legislature cannot "circumvent the protections of [In Re Winship]

merely by 'redefining the elements that constitute different crimes, characterizing

them as factors that bear solely on the extent of punishment.'" Apprendi, 530 U.S.

at 485, quoting Mullaney v. Wilbur, 421 U.S. 684, 698 (1975). Similarly, a

legislature may not recast an element of a crime as an "affirmative defense" because

"it is not within the province of a legislature to declare an individual guilty or

presumptively guilty of a crime." Manley v. Georgia, 279 U.S. 1, 6 (1929). See also

County Court v. Allen, 442 U.S. 140, 158 (1979). As applied to M.G.L. c. 269 § 10,

M.G.L. c. 278 § 7 relieves the Commonwealth of its burden to prove an essential

element of possession of an unlicensed firearm.

It has long been an uncontroversial principle of law that the accusation (i.e.

indictment or complaint) presents the basis or elements of the crime. "In order for

13

an accusation of a crime (whether by indictment or some other form) to be proper under the common law, and thus proper under the codification of the common-law rights in the Fifth and Sixth Amendments, it must allege all elements of that crime[.]" Apprendi, 530 U.S. at 499-500. Here, the complaint against Powell read as follows: "Firearm Without FID Card, Possess c269, s. 10(h)"; "Firearm, Carry Without License Loaded, s. 10(n)"; and "Firearm, Carry Without License c269 s. 10(a)." Appendix C. If the Supreme Judicial Court had applied this basic principle of law to his due process claim, it would have inevitably found that the complaint itself alleges that the absence of license and registration are elements of the respective crimes. The existence of a license cannot then be considered an affirmative defense as Jones[4] wrongly found.

> Courts have long had to consider which facts are elements in order to determine the sufficiency of an accusation (usually an indictment). The answer that courts have provided regarding the accusation tells us what an element is, and it is then a simple matter to apply that answer to whatever constitutional right may be at issue in a case-here, *Winship* and the right to trial by jury...This authority establishes that a "crime" includes every fact that is by law a basis for imposing or increasing punishment (in contrast with a fact that mitigates punishment). Thus, if the legislature defines some core crime and then provides for increasing the punishment of that crime upon a finding of some aggravating fact-of whatever sort, including the fact of a prior conviction-the core crime and the aggravating fact together constitute an aggravated crime, just as much as grand larceny is an aggravated form of petit larceny....One need only look to the kind, degree, or range of punishment to which the prosecution is by law entitled for a given set of facts. Each fact necessary for that entitlement is an element.

---

[4] It is also important to note that Jones was decided long before the Supreme Court held that the Second Amendment encompassed an individual, fundamental right to keep and bear arms. Thus, much of its reasoning that absence of license is not an element of the crime necessarily flows from its reasoning that the possession of a firearm is not a fundamental right but instead an "inherently dangerous act." Jones, 372 Mass. at 405. See infra at pp. 19-22.

14

Apprendi, 530 U.S. at 500-501 (emphases added). Here, the "core crimes", as the complaint itself alleges, are possession of a firearm *without* an FID card and carrying a firearm *without* a license. "[T]he indictment must allege whatever is in law essential to the punishment sought to be inflicted." Id. at 510, quoting 1 J. Bishop, Law of Criminal Procedure 50 (2d ed. 1872). The Commonwealth should have thus not been allowed to punish Powell without carrying the burden to prove beyond a reasonable doubt that he lacked a license and registration card.

The Commonwealth proved at trial only that Powell possessed a firearm. However, possession of a firearm, alone, is not a crime. Indeed, possession of a firearm for lawful purposes is a "fundamental right deserving of protection." McDonald, 130 S. Ct. at 3041 (referencing the debates in the 39th Congress over the Fourteenth Amendment). Therefore, the absence of a license for that firearm is a "fact necessary" to "impose punishment," i.e. to constitute a crime. Long before Heller, in construing federal tax statutes which punished failure to register a firearm, the Supreme Court found that failure to register was an element of the offense. "We find this supposed distinction [between possession and failure to register] entirely unpersuasive, for, as we have found, the possession of a firearm and a failure to register are equally fundamental ingredients of both offenses." Haynes v. United States, 390 U.S. 85, 95 (1968). Nevertheless, the Supreme Judicial Court re-affirmed its thirty-five-year old decision in Jones, which held that it is not the Commonwealth's burden to prove the lack of a firearms license, but instead, "the burden is on the defendant to come forward with evidence of the

15

defense [of a license]." Jones, 372 Mass. at 406; Powell, 459 Mass. at 582. In Jones, the Court reasoned that the existence of a license is an "exception" under M.G.L. c. 278, § 7 to the general prohibition against firearms. Jones, 372 Mass. at 405. Even if that construction were correct, however, "the only real question in the case is whether the exception is so incorporated with the substance of the clause defining the offence as to constitute a material part of the description of the acts, omission, or other ingredients which constitute the offence." United States v. Cook, 84 U.S. 168, 176 (1872). It is clear that the phrases, "without having in effect a license" and "without complying with" the registration requirements, are so incorporated into M.G.L. c. 269 § 10 that they are elements of the crime. Just as the fact that a firearm is a machine gun is an element of 18 U.S.C. § 924(c)(1)(B)(iii), the fact that a person has no license for a handgun lies "closest to the heart of the crime at issue" here. United States v. O'Brien, 130 S. Ct. 2169, 2176 (2010).

Jones relied heavily on Morrison v. California, 291 U.S. 82 (1934) for its conclusion that the Commonwealth need not prove the absence of a license to gain a conviction of possession of an unlicensed firearm. Jones, supra at 408-409. However, "if the Morrison cases are understood as approving the shifting to the defendant the burden of disproving a fact necessary to constitute the crime, the result in the first Morrison case could not coexist with In Re Winship." Patterson v. New York, 432 U.S. 197, 203 n.9 (1977). The proper test, as this Court recognized in Gonzalez v. Dickhaut, 2010 WL 4955559 at *4 (D. Mass. Nov. 30, 2010) (Zobel, J.), is enunciated

16

by Tot v. United States, 319 U.S. 463, 468 (1943), which further restricted burden

shifting after Morrison.

> The upshot of Tot...and [United States v.] Romano, [382 U.S. 136 (1965)]
> is...that a criminal statutory presumption must be regarded as 'irrational' or
> 'arbitrary' and hence unconstitutional, unless it can be at least said with
> substantial assurance that the presumed fact is more likely that not to flow
> from the proved fact on which it is made to depend.

Leary v. United States, 395 U.S. 6, 32-33 (1969). G.L.c. 278 § 7's presumption that a

firearm is unlicensed once the Commonwealth proves knowing possession of a

firearm is irrational and arbitrary because one cannot say with substantial

assurance that knowing possession of a firearm will lead to the possessor lacking a

license.

Even under deferential AEDPA review, this Court (Zobel, J.) held in

Gonzalez v. Dickhaut that the presumption that a defendant must not have a

firearms license is "contrary to law."

> The licensing presumption fails the first Tot requirement. The [Supreme
> Judicial Court's] holding that gun possession does not create a reasonable
> suspicion of a lack of a license forecloses any possibility that a presumption to
> that effect satisfies the "more likely than not" standard. Nor can the
> presumption satisfy Tot's corollary requirement of relative convenience.

Gonzalez, 2010 WL at *6. This Court then granted habeas relief. The government

never appealed this decision. Powell is entitled to the same relief.

### Ground Two: Trial Counsel Was Ineffective For Failing To File A Motion To Suppress Powell's Statement To A Police Officer While In Custody

Trial counsel's failure to move to suppress Powell's statements prior to trial

violated Powell's right to effective assistance of counsel under the Sixth

Amendment. See Strickland v. Washington, 466 U.S. 668, 688 (1984) (counsel's performance must meet an objective standard of reasonableness).

Here, Officer Blas testified at trial that after handcuffing Powell and placing him on the curb, he asked him why he ran and whether he had a license for the firearm. Trial Transcript (Tr.) 102. At this point, Powell was clearly in custody such that an explanation of his rights under Miranda v. Arizona, 384 U.S. 436 (1966) was triggered. United States v. Hughes, 640 F.3d 428, 434 (1st Cir. 2011) (custody defined as "restraint on freedom of movement of the degree associated with a formal arrest," quoting Maryland v. Shatzer, 130 S.Ct. 1213, 1224 (2010)). Blas never testified that he gave Miranda warnings before asking Powell these questions. Trial counsel filed a motion to suppress the physical evidence, but not Powell's statements, prior to trial. If counsel had moved to suppress these statements, the motion would have likely succeeded. In Haskell, the Supreme Judicial Court held that where a police officer places a suspect in custody, the officer must first give Miranda warnings before asking the suspect if he has a license for a firearm because such a question is "a request for a testimonial communication that entitle[s] the defendant to the Fifth Amendment's protections, including the right to refuse to answer." Haskell, 438 Mass. at 796-797 (reversing denial of motion to suppress statements). Haskell relied upon Doe v. United States, 487 U.S. 201, 210 (1988) and Dickerson v. United States, 530 U.S. 428, 444 (2000) to reach this conclusion. Because Blas had placed Powell in custody, Blas was required to give Powell Miranda warnings before asking him for a testimonial communication

18

regarding the existence of a license. Since Blas failed to provide <u>Miranda</u>, the Commonwealth would not have then been able to prove that Powell had knowingly and intelligently waived his <u>Miranda</u> rights beyond a reasonable doubt. <u>See</u> <u>Commonwealth v. Tavares</u>, 385 Mass. 140, 152 (1982).

There is a reasonable possibility that the verdict would have been different if Powell's statements had been excluded from trial. The Commonwealth used his statements either to prove that Powell lacked a license for the firearm or at least to prove his consciousness of guilt. Therefore, counsel was ineffective for not moving to suppress these statements and this failure deprived Powell of an otherwise substantial, available defense. <u>See</u> <u>Commonwealth v. Saferian</u>, 366 Mass. 89, 96 (1974).

### Ground Three: Relieving The State From Proving That The Presumptive Exercise Of The Right To Keep And Bear Arms Is In Fact Unlawful Conduct Violates The Second Amendment

Even assuming that the Commonwealth has, consistent with due process, defined the elements of the firearms offense not to include the necessity of proof that the defendant is unlicensed, the crime, so defined, violates the Second Amendment. The <u>Powell</u> decision opened the door to criminal trials that permit convictions on the sole basis that an individual was exercising his or her Second Amendment rights. It thereby failed to honor what <u>Heller</u> and <u>McDonald</u> clearly mean – individuals have the fundamental right to possess and carry ordinary handguns. "'The very enumeration of the [Second Amendment] right takes out of the hands of government — even the Third Branch of Government — the power to

19

decide on a case-by-case basis whether the right *is really worth* insisting upon.'"

McDonald, 130 S. Ct. at 3049, quoting Heller, 554 U.S. at 634 (emphasis in

original). The D.C. Court of Appeals has held that the unlawful possession of

ammunition ("UA") statute violated the Second Amendment because it cast lack of

registration for ammunition as an affirmative defense:

> While legislatures do have leeway to reallocate burdens of proof so as to
> require the accused to prove some facts as affirmative defenses (rather than
> requiring the prosecution to negate those facts as an element of the offense),
> "there are obviously constitutional limits beyond which [a legislature] may
> not go in this regard." [*Patterson v. New York*, 432 U.S. 197, 210 (1977)].
> Where the Constitution-in this case, the Second Amendment-imposes
> substantive limits on what conduct may be defined as a crime, a legislature
> may not circumvent those limits by enacting a statute that presumes
> criminality from constitutionally-protected conduct and puts the burden of
> persuasion on the accused to prove facts necessary to establish innocence.

Herrington v. United States, 6 A.3d 1237, 1244 (D.C. 2010).

M.G.L. c. 278, § 7, as interpreted by Jones, 372 Mass. at 405, creates a

mandatory presumption that knowing possession of a firearm is unlawful. Anyone

charged under these firearms statutes faces the same presumption of criminality

whether his firearms possession took place inside or outside the home.

Commonwealth v. Colon, 449 Mass. 207, 225-226 (2007). Such a presumption

cannot stand under the Second Amendment, as interpreted by Heller and

McDonald. In Jones, the Supreme Judicial Court reasoned that "[t]he holding of a

valid license brings the defendant within an exception to the *general prohibition*

*against carrying a firearm*, and is an affirmative defense." Jones, 372 Mass. at 406

(emphasis added). A state cannot impose a "general prohibition against carrying a

firearm" without violating the Second Amendment. Thus, the foundation upon

20

which Jones rests fails. The Court also reasoned that "[i]n *Commonwealth v. Davis*, 359 Mass. 758 (1971), involving conviction for carrying a gun in an automobile, we said, 'General Laws c. 269, § 10, proscribes certain inherently dangerous acts, and M.G.L. c. 278, § 7, allows the defendant to show that his conduct is within an exception to the proscription.'" Id. at 405. A state legislature cannot cabin carrying a firearm, alone, as "an inherently dangerous act," subject to criminal prosecution. The fact that firearms *could* be used for an unlawful or dangerous purpose does not diminish the fundamental right to keep and bear arms for "lawful purposes." See McDonald, 130 S. Ct. at 3030, 3044.

The legislative presumption in Massachusetts, however, remains backwards. Rather than afford a criminal defendant the presumption of innocence, the state legislature presumes him guilty on the assumption that possession of a firearm, alone, is an "inherently dangerous act." No more. McDonald restored the presumption of innocence, invalidating statutes like M.G.L. c. 278, § 7, which violate a defendant's presumptively protected exercise of his right to keep and bear arms. As McDonald emphasized, this right does not have "second-class" status in the Bill of Rights. McDonald, supra at 3044. It follows from a restored presumption of innocence that a defendant need not produce one iota of evidence or speak one word at trial with regard to the licensing element. It is incumbent upon the state at all times to prove that a defendant possessed the gun illegally or in a manner which the Second Amendment does not protect. If it were otherwise, then states could always punish individuals like the petitioner simply for exercising their Second

21

Amendment rights. See City of Lakewood v. Pillow, 501 P.2d 744, 745-46 (Colo. 1972) (ordinance prohibiting possession of dangerous or deadly weapon unconstitutionally overbroad where it prohibited activities which under police power could not be reasonably classified as unlawful).

## Ground Four: The Text And History Of The Second Amendment Confirm That Eighteen Year Old Adults Have Equal Constitutional Rights To Keep And Bear Ordinary Firearms Inside And Outside The Home

### A. Powell Has Standing To Bring These Constitutional Claims

The Supreme Judicial Court's holding – unsupported by any federal constitutional law – that Powell lacked standing to bring his Second Amendment and Equal Protection claims because he did not apply for a license is clearly contrary to Supreme Court law.

In order to gain standing to challenge a statute, an individual must "present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged action; and redressable by a favorable ruling." Horne v. Flores, 129 S.Ct. 2579, 2592 (2009). Powell meets all three prongs. First, the injury here is unquestionable because Powell was prosecuted and convicted under the firearms statutes he now challenges under the Second and Fourteenth Amendments. Second, this injury or criminal prosecution would have occurred with or without a futile application for a license to carry, making the injury "fairly traceable" to the challenged statutes. See Chicago v. Atchison, Topeka & Santa Fe R.Y. Co., 357 U.S. 77, 89 (1958) (where the statute is "completely invalid insofar as it applies to [the company], that company was not obligated to apply for a certificate

22

of convenience and necessity and submit to the administrative procedures incident thereto before bringing this action.") and Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton, 536 U.S. 150, 156 (2002) (invalidating permit requirement even though "Petitioners did not apply for a permit."). Third and finally, a favorable ruling would have invalidated the firearms statutes as unconstitutional and reversed Powell's firearms convictions, redressing his injury.

Since Powell was eighteen years of age at the time of his arrest, he was automatically disqualified from obtaining a license to carry a handgun; from purchasing a handgun; and from possessing a handgun even in the home except in severely restricted circumstances. Therefore, even if there were a requirement to apply for a license before a criminal defendant may challenge the licensing statute, that requirement would be eliminated here by the doctrine of futility. See Freedman v. State of Maryland, 380 U.S. 51, 56 (1964) ("In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license"); Palazzolo v. Rhode Island, 533 U.S. 606, 625-26 (2001) (where limitations imposed by wetland regulations were clear, and there was no indication that kind of use sought by landowner would have been allowed, court did not require submission of "futile applications" with other agencies); and McCarthy v. Madigan, 503 U.S. 140, 148 (1992) (summarizing prior Supreme Court cases, including cases holding that exhaustion not required where "any such application

23

[would have been] utterly futile" or where requiring that administrative process be invoked "would be to demand a futile act"). In any event, "[s]tates must comply with the Constitution regardless of an individual's personal decisions." Smith v. South Dakota, 781 F.Supp.2d 879, 887 n.8 (D. South Dakota 2011). Massachusetts may not then "subject [the Second Amendment] to an entirely different body of rules than the other Bill of Rights guarantees that [this Court has] held to be incorporated into the Due Process Clause." McDonald, 130 S. Ct. at 3044.

The Second Circuit Court of Appeals and the D.C. Court of Appeals have found standing in these same circumstances. Bach v. Pataki, 408 F.3d 75, 77 (2nd Cir. 2005) ("Bach never applied for a New York handgun license, and...defendants contended that Bach's claims were not justiciable because Bach accordingly lacked 'standing.'....We hold that Bach's failure to file a license application does not pose an obstacle to consideration of his claims.") and Plummer v. United States, 983 A.2d 323, 342 (D.C. 2009) (defendant "had standing to raise the Second Amendment issue as a defense to the criminal charges against him...even though he did not attempt to obtain a registration certificate and license for his handgun prior to his arrest."). See also Ezell v. City of Chicago, 651 F.3d 684, 696 (7th Cir. 2011) (plaintiff had standing in pre-enforcement challenge on Second Amendment grounds due to the "probability of future injury," i.e. a criminal prosecution). Other courts have assumed standing and delved into the merits of the Second Amendment claim. See United States v. Vongxay, 594 F.3d 1111, 1114 (9th Cir. 2010) and United States v. Booker, 644 F.3d 12, 25 (1st Cir. 2011).

24

The Supreme Judicial Court's divestment of standing works mischief in unfairly denying criminal defendants an opportunity to mount significant constitutional challenges to the firearms statutes. Individuals like Powell must also reconcile with the fact that the Supreme Judicial Court has declared that their failure to obtain a firearms license or registration card is the actual violation of law. Powell, 459 Mass. at 589-591. Yet the Commonwealth does not need to prove that fact at trial. Id. at 582. An individual's loss of standing is thus predicated upon an essential fact that the Commonwealth carries no burden to prove. The unconstitutional presumption that a criminal defendant must not have obtained a license or registration card directly leads to this loss of standing, which absolves the Commonwealth from having to demonstrate that its firearms statutes pass constitutional muster. Such a self-contradictory holding, without even passing or *sub silentio* reliance upon Supreme Court precedent, is entitled to no deference.

## B. Eighteen-Year Old Adults Possess The Right To Keep And Bear Arms Just As They Possess All Other Fundamental Constitutional Rights.

Despite recognition by all fifty states and the United States Government that eighteen-year old persons are adults capable of assuming a myriad of rights and responsibilities, see Bellotti v. Baird, 443 U.S. 622, 634 (1979) and Roper v. Simmons, 543 U.S. 551, 579 (2005) (Appendixes B–D), the Massachusetts firearms statutes deny these adults the fundamental right to keep and bear arms. M.G.L. c. 140 § 131(d)(iii) prohibits any Massachusetts resident under twenty-one years of age from possessing an ordinary handgun. An eighteen-year old adult's mere

25

possession of a handgun subjects him or her to criminal charge and prosecution under M.G.L. c. 269 § 10. Eighteen-year old persons cannot then lawfully possess a loaded or unloaded firearm anywhere since they cannot obtain a license to do so. See M.G.L. c. 140, §§ 129B, C. The only narrow exception is where the eighteen-year old person is both in the home and under the "direct supervision" of a license holder. M.G.L. c. 140, § 129B(6)(ii). Eighteen-year old persons may not then independently have ordinary handguns even in the home. These persons are in the same position as the residents of the District of Columbia, who were banned from possessing a particular type of gun, i.e. handgun, in their homes. See Heller, 554 U.S. at 627.

Under any level of scrutiny, the Massachusetts firearms statutes violate the Second Amendment right to keep and bear arms and the Fourteenth Amendment right to equal protection. Although the Supreme Court has not yet announced a standard of review, Justice Scalia's concurrence in McDonald provided a proper analytical framework for Second Amendment claims. "No fundamental right – not even the First Amendment – is absolute. The traditional restrictions go to show the scope of the right, not its lack of fundamental character." McDonald, 130 S. Ct. at 3056 (Scalia, J., concurring). The most important question then is whether the absolute ban of eighteen-year old adults from possessing or carrying firearms was a "traditional" restriction imposed at the time the Bill of Rights was ratified and in the years following ratification. See Id. at 3037-3040 (analyzing traditions during the colonial era and the Reconstruction era). If these adults were not traditionally excluded from the Second Amendment right, then they may exercise that right in

26

and out of the home unless such exercise occurs in a "sensitive place." Heller, 554 U.S. at 626. "In any event, the demise of watered-down incorporation...means that we no longer subdivide Bill of Rights guarantees into their theoretical components, only some of which apply to the States. The First Amendment freedom of speech is incorporated – not freedom to speak on Fridays, or to speak about philosophy." McDonald, 130 S. Ct. at 3054 n. 5 (Scalia, J., concurring).

The historical traditions of the United States and the common practices of the states, including Massachusetts, leave no doubt that eighteen-year old persons are considered adults who have assumed a host of rights and obligations, including the right to keep and bear arms. Near the time of the Second Amendment's ratification, these adults also possessed the right to keep and bear arms. The first federal militia act required every man, eighteen years of age and older, to enroll in the militia. United States Militia Act, 1 Stat. 271, § 1(I) (passed May 8, 1792). It provided that every citizen enrolled in the militia within six months of being enrolled was to "provide himself" with a good musket, firelock or rifle and ammunition for this weapon, and was to "appear, so armed, accoutered and provided, when called out to exercise, or into service." This indicates that able bodied men eighteen and over were not only required to possess firearm when they were serving on militia duty, but they were required to possess and retain their own firearms when they were not serving on militia duty.[5] This also indicates that the

---

[5] Under the militia acts, all able bodied white male citizens were enrolled in the militia and notified of this fact when they became eighteen. They were then given six months within which to provide themselves with the required arms and

27

founding generation recognized eighteen-year old persons as fully ready and capable to manage the weapons of war. "The law having made eighteen years the age for military duty, necessarily gives the power at that age, to enlist in any company which is 'part of the militia.'" Dewey, Petitioner, 11 Pick. 264, 266 (1831). "The parent's consent is not required" and the parent's "assent to, or dissent from the son's enlistment, cannot affect its validity." Id. at 266. Thus, the founding generation believed that persons eighteen and older could be trusted with firearms both in and out of the militia. This is to be expected. Persons in the military are much more likely to be faced with serious questions as to when to use deadly force than persons in civilian life.

In 1903, the Militia Act was amended to provide for an organized militia known as the National Guard and a separate Reserve Militia. The militia was to "consist of every able-bodied male citizen of the respective States, Territories, and the District of Columbia, and every able-bodied male of foreign birth who has declared his intention to become a citizen, who is more than eighteen and less than forty-five years of age." 32 Stat. 775, Act of 1903, c.196, § 1. In 1956, the Act was amended again to provide that "the militia of the United States consists of all able-bodied males at least 17 years of age[.]" 70 Stat. 14, Act of August 10, 1956, c.1241. Under current federal law, eighteen-year old males must submit a form to the

equipment or have these arms and equipment provided to them by their parents or guardians. Haynes v. Jenks, 2 Pick 172, 174-76 (1824). Within six months time, they were to report for training and exercise in the militia with proper arms and equipment. Id. at 174. Persons who appeared with borrowed equipment were subject to a fine. Commonwealth v. Bullard, 9 Mass. 269, 270 (1812).

28

Selective Service System, which subjects them to a potential draft into the United States Army. See "Military Selective Service Act," 50 U.S.C.A. Appendix, § 454. Eighteen-year old persons can also volunteer to join the military where they can lawfully possess and use firearms. Persons over the age of seventeen may possess firearms if they are serving in the National Guard. M.G.L. c. 33, §§ 2,3,4. When called out, they must appear at the appointed time and place "armed and equipped" and prepared to follow orders. M.G.L. c. 33, § 46. Finally, those over eighteen years of age may possess firearms for any lawful purpose without federal penalty. 18 U.S.C. § 922(x)(2), (5).

Eighteen-year old persons have also traditionally been free to exercise other fundamental rights as fully as other adults. They have the right to marry in most states, including Massachusetts, see G.L. c. 207, §§ 7, 25, and assume the duties inherent in marriage. See DeMatteo v. DeMatteo, 762 N.E.2d 797, 808 (Mass. 2002) ("Marriage is not a mere contract between two parties but a legal status from which certain rights and obligations arise"). The Twenty-Sixth Amendment to the United States Constitution specifically grants eighteen-year old persons the right to vote. Under M.G.L. c. 234A, eighteen-year old persons must serve upon juries when the Commonwealth summons them. The Commonwealth treats eighteen-year olds as "adults" for purposes of trying them in a criminal prosecution. See M.G.L. c. 119 § 74.

In short, eighteen-year old persons exercise a host of solemn rights and responsibilities, which the United States Government and the Commonwealth have

entrusted to them. Society's imposition of these responsibilities reflects its treatment of eighteen-year olds as persons who are free of supervisory control. By contrast, society treats juveniles as persons who need proper guidance and control over their conduct. "'The reasons why juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult.'" Roper, 543 U.S. at 561, quoting Thompson v. Oklahoma, 487 U.S. 815, 835 (1988) (plurality opinion). In Roper, this Court struck down the death penalty for juvenile offenders under the age of eighteen in large part because of the "comparative immaturity and irresponsibility of juveniles[.]" Roper, 543 U.S. at 569. Given the overwhelming societal consensus on the point, this Court found that "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood[.]" Id. at 574. See also J.D.B. v. North Carolina, 131 S. Ct. 2394, 2406 (2011) (noting with approval Yarborough v. Alvarado, 541 U.S. 652, 669 (2004) (Connor, J., concurring) (although age may be relevant in a "custody" inquiry under Miranda v. Arizona, 384 U.S. 436 (1966), it should not be a factor in this case because the defendant "was almost 18 years old at the time of his interview.")) and United States v. A.R., 203 F.3d 955, 961 (6th Cir. 2000) (upholding transfer of a particular juvenile into the adult criminal justice system because "the closer a defendant is to eighteen, the greater the presumption that he be treated as an adult."). The clear line of eighteen as the age of majority applies equally to the exercise of Second Amendment rights. See United States v. Rene E., 583 F.3d 8, 15 (1st Cir. 2009) (discussing historical

tradition of prohibiting children from handling firearms) and State v. Sieyes, 225 P.3d 995, 1005 (Wash. 2010) (keeping "powder dry" on whether juveniles have Second Amendment right to keep and bear arms).

Despite this tradition, M.G.L. c. 140 § 131 provides no exceptions to the rule that eighteen-year old individuals cannot carry handguns outside the home. The Second Amendment encompasses the right to carry a handgun for lawful purposes outside the home. Heller confirmed that the term, to "bear," in the Second Amendment means to "'wear, bear, or carry...upon the person or in the clothing or in a pocket[.]'" Heller, 554 U.S. at 584, quoting Justice Ginsburg's construction of "carries a firearm" in Muscarello v. United States, 524 U.S. 125, 143 (1998) (dissenting opinion). Given that the Second Amendment protects the right to "bear" or "carry" arms, this right must extend outside the home. Otherwise, the "individual right to possess and carry weapons in case of confrontation," Heller, supra at 584, would be rendered a nullity. Therefore, "the legislature has no power to prohibit a citizen from bearing arms in any portion of the state...The legislature may...regulate the exercise of this right, but may not prohibit it." In Re Brickey, 70 P. 609, 609 (Idaho 1902). See also State v. Rosenthal, 55 A. 610, 611 (Vt. 1903) (ordinance prohibiting carrying dangerous concealed weapon without written permission of mayor or police chief unconstitutional).

This Court referred to firearms bans in "sensitive places," such as government buildings and schools, as presumptively lawful. Heller, 554 U.S. at 626. It would strain credulity to cast the entire public as a "sensitive place." Even Justice

31

Stevens' dissenting opinion in Heller recognized the illogic of restricting the right to bear arms to the home. "Given the presumption that most citizens are law abiding, and the reality that the need to defend oneself may suddenly arise in a host of locations outside the home, I fear that the District's policy choice may well be just the first of an unknown number of dominoes to be knocked off the table." Heller, supra at 680 (Stevens, J., dissenting). Just as the statutes at issue in Heller and McDonald absolutely prohibited all individuals from possessing handguns, the statutes at issue here absolutely prohibit eighteen-year old individuals like Powell from carrying handguns. Such a ban cannot be construed as a regulation. "We discuss *infra* the legislature's power to *reasonably regulate* the exercise of the right to bear arms; however, *W.Va.Code,* 61-7-1 [1975] *prohibits* the exercise of this right by infringing upon the constitutional right to bear arms for the defensive purposes guaranteed in the amendment[.}" State ex rel. City of Princeton v. Buckner, 377 S.E.2d 139, 144 (W.V. 1988) (construing right under state constitution).

There is no compelling interest served under a fundamental rights analysis or under an equal protection analysis by denying eighteen-year old adults from obtaining the "quintessential self-defense weapon." Heller, 554 U.S. at 629. The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439 (1985). Eighteen-year old adults are similarly situated to twenty-one year old adults as society has deemed both groups mature and responsible; thus, they should be treated the same. The statute's discrimination

32

against all eighteen-year old adults does not serve even a rational interest since it is not substantially related to the statute's objective of preventing irresponsible people access to dangerous weapons. See Ruggiero v. Police Comm'r of Boston, 18 Mass. App. Ct. 256, 258-259 (1984). In Craig v. Boren, this Court held that a law that prohibited the sale of beer to eighteen to twenty-year old males while permitting it to eighteen to twenty-year old females failed to demonstrate a rational basis since such discrimination was not "substantially related to achievement of the asserted governmental objective of enhancing traffic safety." Craig v. Boren, 429 U.S. 190, 190 (1976). Similarly here, the Commonwealth has not shown that keeping handguns out of a class of law-abiding adults is "substantially related" to any public safety interest.

Although states certainly have a legitimate interest in protecting the public from dangerous weapons, those weapons only become dangerous when they fall into the hands of dangerous or incompetent people. The Supreme Judicial Court has recognized this very point: "While we are cognizant that unlicensed possessors of firearms may use firearms unlawfully, unlicensed possession of a firearm itself is a regulatory crime. It is passive and victimless." Young, 453 Mass. at 713. Eighteen-year old adults have a higher level of maturity and responsibility than juveniles such that their right to keep and bear arms should be unfettered. This Court has "recognized three reasons justifying the conclusion that the constitutional rights of children cannot be equated with those of adults: the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner;

33

and the importance of the parental role in child rearing." Bellotti, 443 U.S. at 634. Based on long societal tradition, this Court has drawn the age of majority and maturity at eighteen. Thus, a ban against firearms possession by these adults must fail because "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." Heller, 554 U.S. at 636.

Even if the Commonwealth could demonstrate a compelling interest in "regulating" a young adult's ability to possess firearms, an absolute ban upon the exercise of that fundamental right is far from narrowly tailored. "Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority." Planned Parenthood of Cent. Mo. v. Danforth, 428 U.S. 52, 74 (1976). The Second Circuit Court of Appeals has similarly held that "[s]imply denying the existence of a constitutional right is too blunt an instrument to resolve the question of juvenile rights to freedom of movement." Ramos v. Town of Vernon, 353 F.3d 171, 178 (2nd Cir. 2003). See also Rene E., 583 F.3d at 13-14 (holding that 18 U.S.C. § 922(x)'s "*narrowly* drawn federal prohibition on handgun possession by juveniles that contains exceptions for self-and other-defense in the home" is constitutional) (emphasis added).

In sharp contrast to Powell's historical showing, the Commonwealth has never pointed to any evidence in the historical record showing that eighteen-year old adults were traditionally restricted from possessing firearms. The Commonwealth has also never shown that eighteen-year old adults are, as a class, either less competent to handle firearms or more dangerous when wielding such

weapons. After McDonald, the Commonwealth's generalized "public safety interest" does not allow it to absolutely deny an entire class of adults from exercising their fundamental right to possess ordinary firearms. "Municipal respondents cite no case in which we have refrained from holding that a provision of the Bill of Rights is binding on the States on the ground that the right at issue has disputed public safety implications." McDonald, 130 S. Ct. at 3045. Even if the "public safety interest" could reach such a level as to justify extinguishing a group's Second Amendment right, the Commonwealth has not shown that banning eighteen-year old adults from possessing firearms actually reduces danger to the public.

> To be upheld, then, the bans must be justified either by a scope argument (that the constitutional right explicitly or implicitly excludes the prohibited class of people) or by a danger reduction argument (that people in the prohibited class are so unusually dangerous that even a total ban on their gun possession is constitutional).

Volokh, Eugene, Symposium: The Second Amendment and the Right to Bear Arms After D.C. V. Heller: Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1497 (June 2009). With the exception of the "right" to drink alcohol, which is by no means a fundamental one, eighteen-year old adults can exercise their rights, such as voting and marrying, as fully as twenty-one-year old adults can. Therefore, the Commonwealth cannot justify this ban because the scope of the Second Amendment reaches eighteen-year old adults and the ban does not protect any identifiable public safety interest.

Law-abiding, eighteen-year old adults are not in the same category as felons or the mentally ill, who can be prohibited from possessing firearms without violating the Second Amendment. McDonald, 130 S. Ct. at 3047. The Commonwealth points to nothing in the historical or legislative record that supports the position that eighteen-year old adults, as an entire class, are deemed "dangerous" or "incompetent" as felons or the mentally ill are. Law-abiding, eighteen-year old adults share no characteristics with felons, who are deemed presumptively dangerous due to their commission of serious crimes. See Vongxay, 594 F.3d at 1115 ("felons are categorically different from the individuals who have a fundamental right to bear arms."). They also share no characteristics with the mentally ill, who are deemed presumptively incompetent to handle firearms due to their fragile and potentially perilous mental state. See United States v. Murphy, 681 F. Supp.2d 95 (D. Me. 2010) (upholding federal firearms ban against persons hospitalized pursuant to Maine's emergency involuntary admission statutes). The Commonwealth has never contravened the fact that our society and legal framework have treated eighteen-year old persons as mature and responsible and thus, have granted them greater constitutional protections.

In support of its discrimination against eighteen-year old adults, the Commonwealth has also offered no statistical evidence that eighteen-year old adults are more dangerous or incompetent than twenty-one-year old adults when handling firearms. Contrast Craig v. Boren, 429 U.S. at 200-201 (appellees offered statistical survey that "youths aged 17-21 were found to be overrepresented among those

36

killed or injured in traffic accidents, with males again numerically exceeding females in this regard," but nevertheless failed to show a rational basis for discriminating against eighteen-twenty year old males). In Massachusetts itself, there is no longstanding tradition prohibiting eighteen-year old persons from the right to keep and bear arms. The restriction on issuing firearms licenses to persons under twenty-one was first introduced in 1998. 1998 Mass. Legisl. Serv. Ch. 180, § 41. There is no legislative history from 1998 to explain the findings in support of the age increase. Before that year, Massachusetts law merely prohibited the issuance of firearm licenses to minors under eighteen. See 1972 Mass. Legisl. Serv. Ch. 415 and 1986 Mass. Legisl. Serv. Ch. 481, § 2. The prohibition against issuing licenses to carry to persons under twenty-one is not based on longstanding tradition but simply on the fluctuating opinions of the legislature. As a result, the Commonwealth has not even provided a rational basis to support discriminating against this group. See United States v. Chester, 628 F.3d 673, 683 (4th Cir. 2010) ("The government has offered numerous plausible *reasons* why the disarmament of domestic violence misdemeanants is substantially related to an important government goal; however, it has not attempted to offer sufficient *evidence* to establish a substantial relationship between [18 U.S.C.] § 922(g)(9) and an important government goal.") (emphases in original).

This Court recently held that lawful permanent residents are considered "the people" under the United States Constitution and that the defendant failed to

support excluding them from the protections of the Second Amendment. It reasoned:

> Although Massachusetts has an interest in regulating firearms to prevent dangerous persons from obtaining firearms as recognized in *Booker*, the statute here fails to distinguish between dangerous non-citizens and those non-citizens who would pose no particular threat if allowed to possess handguns...Any classification based on the assumption that lawful permanent residents are categorically dangerous and that all American citizens by contrast are trustworthy lacks even a reasonable basis.

Fletcher v. Haas, 2012 WL 1071713 at *14 (D. Mass. March 30, 2012) (Woodlock, J.). This reasoning equally applies here because Massachusetts has failed to distinguish between dangerous eighteen year old adults from non-threatening eighteen year old adults. It also provides no opportunity for young adults to prove their responsible handling of handguns by, for example, requiring them to take a training course prior to being allowed to purchase handguns, possess them independently in the home, or carry them outside the home. Instead, the handgun prohibition is blanket and absolute. The assumption that all eighteen to twenty year old adults must be reckless deserving no Second Amendment protection while all twenty-one year old adults have suddenly transformed into responsible citizens deserving the full exercise of this fundamental right "lacks even a reasonable basis." Moreover, it is an assumption belied by United States history and tradition which has marked eighteen years as the age of full adulthood bearing the traits of responsibility, independence and maturity.

38

Conclusion:

For the foregoing reasons, this Court should order that Powell's convictions

were unconstitutionally obtained and order Powell's release immediately.

> Respectfully Submitted,
> AARON POWELL
> By his attorney,
>
> K. Hayne Barnwell
> BBO No. 667952
> Carney & Bassil
> 20 Park Plaza, Suite 1405
> Boston, MA 02116
> 617-338-5566
> kbarnwell@carneybassil.com

Dated: April 23, 2012