UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                               )
AARON POWELL,                  )
                               )
            Petitioner,        )
                               )
        v.                     )     CIVIL ACTION
                               )     NO. 12-10744-WGY
STEVEN W. TOMPKINS,[1]         )
Sheriff, Suffolk County,       )
                               )
            Respondent.        )
                               )
```

MEMORANDUM & ORDER

YOUNG, D.J.                                  February 28, 2013

## I.   INTRODUCTION

In the wake of District of Columbia v. Heller, 554 U.S. 570 (2008), this petition for a writ of habeas corpus is the vehicle for a massive frontal assault on Massachusetts's gun control legislation.  The attack fails.

Aaron Powell ("Powell") brings this habeas petition under 28 U.S.C. section 2254, appealing from a decision by the Massachusetts Supreme Judicial Court ("Supreme Judicial Court") affirming his convictions for, inter alia, possession of a firearm without a firearm identification ("FID") card and

_____

[1] Andrea J. Cabral ("Cabral"), who served as the Sheriff of Suffolk County, Massachusetts, from 2002 to 2013, was initially listed as the respondent in this case.  Because Cabral has since departed from her post, the name of Cabral's recently appointed successor has replaced her own in the caption.

carrying a firearm without a license.  In his petition, Powell contends that (1) the statutory presumption in Massachusetts General Laws chapter 278, section 7, placing the burden of producing evidence of an FID card and a license to carry a firearm on the defendant, violates his due process rights under the Fourteenth Amendment and his right to bear arms under the Second Amendment;[2] (2) trial counsel's failure to move to suppress statements made by Powell to a police officer while in police custody violated Powell's Sixth Amendment right to effective assistance of counsel; and (3) Massachusetts General Laws chapter 140, section 131(d)(iv) is unconstitutional because, in setting the minimum age for obtaining a license to carry a firearm at twenty-one, it is violative of the rights of eighteen- to twenty-year-olds under the Second Amendment and under the Equal Protection Clause of the Fourteenth Amendment.

## A.   Procedural Posture

Subsequent to a bench trial held on January 30, 2009, in the Central Division of the Boston Municipal Court, Powell was convicted of (1) possession of a firearm without an FID card, in violation of Massachusetts General Laws chapter 269, section

---

[2] Powell, in his petition for habeas, characterized his Fourteenth and Second Amendment claims as two separate grounds for relief.  Pet. Relief Conviction Sentence Person State Custody ("Habeas Pet.") 6, 9, ECF No. 1.  Because both claims go to the constitutionality of Massachusetts General Laws chapter 278, section 7, however, this Court will address them concurrently.

10(h); (2) carrying a loaded firearm without a license, in violation of Massachusetts General Laws chapter 265, section 10(n); (3) resisting arrest, in violation of Massachusetts General Laws chapter 268, section 32B; and (4) carrying a firearm without a license, in violation of Massachusetts General Laws chapter 269, section 10(a).[3]  Pet. Relief Conviction Sentence Person State Custody ("Habeas Pet.") 2-3, ECF No. 1; see also Pet'r's Mem. Law Supp. Pet. Writ Habeas Corpus ("Pet'r's Mem.") 3-4, ECF No. 2.  Powell was sentenced that same day to eighteen months in the South Bay House of Correction and to probation on and after his release for a period of three years.[4]  Habeas Pet. 2.

Powell initially appealed his convictions to the Massachusetts Appeals Court, but the appeal was ultimately taken up by the Supreme Judicial Court sua sponte on August 24, 2010. Habeas Pet. 3.  On April 28, 2011, the Supreme Judicial Court affirmed all of Powell's convictions.  Id.; see Commonwealth v. Powell, 459 Mass. 572 (2011), cert. denied sub nom., 132 S. Ct. 1739 (2012).  Having exhausted all available state remedies,

---

[3] A fifth count, assault and battery on a police officer, in violation of Massachusetts General Laws chapter 265, section 13D, was dismissed by the court before trial at the request of the Commonwealth.  Supplemental Answer 102.

[4] On September 30, 2011, after violating his probation, Powell was sentenced to an additional two years in prison and given fifty days credit in the South Bay House of Correction. Habeas Pet. 2.

Powell timely filed a petition for writ of certiorari in the Supreme Court, which was denied on March 19, 2012.  Habeas Pet. 4; see Powell v. Massachusetts, 132 S. Ct. 1739 (2012).

On April 23, 2012, Powell filed a petition for a writ of habeas corpus in this Court and included with it a memorandum in support of his petition.  Habeas Pet.; Pet'r's Mem.  The Commonwealth electronically filed an answer to Powell's petition on June 1, 2012, Answer, ECF No. 10, and on the same day, manually filed a supplemental answer with this Court,[5] Supplemental Answer.  On August 31, 2012, the Commonwealth submitted a memorandum in opposition to Powell's petition. Resp't's Mem. Law Opp'n Pet. Writ Habeas Corpus ("Resp't's Mem."), ECF No. 15.  Powell submitted a reply to the Commonwealth's opposition on September 14, 2012.  Pet'r's Reply Resp't's Opp'n Pet. Writ Habeas Corpus, ECF No. 16.

## B.  Facts

The background of this case is set forth in extensive detail in the earlier decision by the Supreme Judicial Court.  See Powell, 459 Mass. at 575-76, 582.  Because Powell does not contest the accuracy of the Supreme Judicial Court's account, this Court accepts it without inquiry.  See 28 U.S.C. §

---

[5] Notice of the manual filing of the supplemental answer was provided to the Court on June 1, 2012, but recorded in the district's Case Management/Electronic Case Filing system on June 4, 2012.  Notice Manual Filing, ECF No. 11.

2254(e)(1) (noting that, on habeas review, "determination[s] of
. . . factual issue[s] made by a State court shall be presumed to
be correct").   Nevertheless, this Court will recount in summary
fashion those facts that are pertinent to the disposition of this
habeas petition.

Around 11 o'clock in the evening on August 20, 2008, two
Boston police officers, Manuel Blas ("Officer Blas") and Scott
Roby ("Officer Roby"), were patrolling the Roxbury neighborhood
of Boston in an unmarked police cruiser when they came across a
large gathering of teenagers and young adults at the intersection
of Sonoma Street and Maple Street.   Powell, 459 Mass. at 575.
The twenty-five or so men and women assembled around the
intersection were organized into three distinct groups, and it
seemed to Officer Blas as though some sort of altercation was
about to take place.   Id.

Peering out of the police cruiser, Officer Blas noticed a
young man, who happened to be Powell,[6] standing apart from all of
the other individuals.   Id.   Powell observed the officers and
then looked away, after which point he proceeded to walk toward
the officers and through one of the assembled groups.   Id.   While
walking, Powell placed his right hand on his hip and his left
hand on the center of his waist to grasp what appeared to Officer

---

[6] At the time, Powell was eighteen years of age.   Id. at 573
n.2.

5

Blas to be a gun.  Id.  After making his way past the crowd,
Powell took off running, prompting Officer Blas to leave his
police cruiser and make chase.  Id. at 576.  While in pursuit,
Officer Blas witnessed Powell brandish a .22 caliber revolver,
which caused Officer Blas to draw his gun and twice shout, "Drop
it."  Id.  Powell ignored Officer Blas's command and made his way
to a fence that ran alongside a driveway near a garage.  Id.
While attempting to scale the fence, Powell dropped the revolver
on the ground.  Id.  Eventually, after first encountering a pair
of security guards who were working in the area, Powell was
arrested by Officer Blas.[7]  Id.

Shortly thereafter, Officer Blas asked Powell to explain why
he had run away from the police cruiser and whether he had a
license for the firearm that he had dropped.  Id. at 582.
Without first being advised of his Miranda rights, Powell
responded by saying that he did not have a firearm.  Id.  There
is no indication in the record that Powell ever answered Officer
Blas's question regarding the possession of a firearms license or
that he at any point furnished a license to the police.

## II. ANALYSIS

### A.  Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of

---

[7] The revolver, which was later determined to be loaded, was
collected by Officer Roby.  Id.

1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended in scattered sections of the U.S. Code), a federal court is permitted to grant habeas relief with respect to any and all claims adjudicated on the merits in a state court only if such adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  A state court's decision is "contrary to" clearly established federal law if it "applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts."  Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court's decision involves an "unreasonable application" of clearly established federal law if it "correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case."  Id.  A federal court sitting in habeas is instructed to accord decisions handed down by a state court considerable deference, Renico v. Lett, 130 S. Ct. 1855, 1862 (2010), and a habeas petitioner must bear the weighty burden of proving that the state court decision in question failed to

conform to the letter of Supreme Court precedent or to represent an appropriate extension thereof, see Pelletier v. Russo, No. Civ.A. 05-30014-MAP, 2006 WL 335280, at *5 (D. Mass. Feb. 9, 2006) (Ponsor, J.) (citing Bell, 535 U.S. at 693).

**B.  Statutory Presumption Pertaining to the Possession and Carrying of a Firearm Without a License**

Massachusetts General Laws chapter 269, section 10(h) authorizes punishment for anyone who "owns [or] possesses . . . a firearm . . . without complying with the provisions of [Massachusetts General Laws chapter 140, section 129C]."  Mass. Gen. Laws ch. 269, § 10(h)(1).  Massachusetts General Laws chapter 140, section 129C, when read in concert with a companion provision in Massachusetts General Laws chapter 140, section 129B, provides that an individual may not own or possess a firearm in her home or place of business without first obtaining an FID card from her local licensing authority.  See Mass. Gen. Laws ch. 140, §§ 129B(1), 129C; see also Commonwealth v. Loadholt, 460 Mass. 723, 724 n.1 (2011).  Conversely, Massachusetts General Laws chapter 269, section 10(a) subjects to criminal charges anyone who "knowingly has in [her] possession . . . a firearm, loaded or unloaded . . . without . . . having in effect a license to carry firearms" outside of her home or place of business.  See Mass. Gen. Laws ch. 269, § 10(a)(2); Commonwealth v. Eberhart, 461 Mass. 809, 810 n.1 (2012). Massachusetts General Laws chapter 278, section 7 requires that

"[a] defendant in a criminal prosecution, relying for his justification upon a license, . . . shall prove the same; and, until so proved, the presumption shall be that he is not so authorized."  Mass. Gen. Laws ch. 278, § 7.  Overlaid on Massachusetts General Laws chapter 269, section 10(h) and (a), Massachusetts General Laws chapter 278, section 7 insists that a person possessing or carrying a firearm in the Commonwealth be considered to be unlicensed to engage in such activity unless she produces evidence to the contrary.

Powell argues that the statutory presumption embedded in Massachusetts General Laws chapter 278, section 7 abrogates the due process rights accorded him under the Fourteenth Amendment and is violative of his right to keep and bear arms under the Second Amendment.  Pet'r's Mem. 12-17, 19-22.  This Court will address each of these claims in the order presented.

### 1. Due Process

Powell urges this Court to sidestep the standard enunciated by AEDPA and to review his due process claim de novo.  Pet'r's Mem. 7-9.  He makes much of the fact that, in deciding his appeal, the Supreme Judicial Court made no mention of any Supreme Court cases or other relevant federal authorities.  Id.  Yet the Supreme Court itself has already spoken to this very issue, holding that state courts need not even be aware of -- let alone cite to -- its decisions, "so long as neither the reasoning nor

the result of the state-court decision contradicts them." <u>Early</u>
v. <u>Packer</u>, 537 U.S. 3, 8 (2002) (per curiam).  After referencing
myriad Massachusetts cases holding that the burden to produce
evidence of an FID card and a license to carry rests solely upon
the defendant, the Supreme Judicial Court in <u>Powell</u> closed by
remarking that "[w]e have declined to revisit these conclusions,
and find no reason to do so now."  459 Mass. at 582 (citation
omitted).  Admittedly, this terse response likely does little to
allay Powell's concerns, and the Court ought note that it is
sympathetic to this view.  Nonetheless, the reasons proffered by
the Supreme Judicial Court more than suffice to show that it
adjudicated Powell's due process claim on the merits.  <u>See</u>
<u>Harrington</u> v. <u>Richter</u>, 131 S. Ct. 770, 784 (2011) (holding that
AEDPA "does not require that there [even] be an opinion from the
state court explaining the state court's reasoning" in order for
a court to properly deem a habeas petitioner's claims barred
under 28 U.S.C. section 2254(d)).

     The only question left to be answered, then, is whether the
reasoning or the result of the Supreme Judicial Court's decision
ran contrary to established federal law.  In <u>In re Winship</u>, 397
U.S. 358 (1970), the Supreme Court held that due process requires
that the prosecution prove beyond a reasonable doubt each element
of every crime for which a defendant is being prosecuted.  <u>See</u>
<u>id.</u> at 362.  Powell contends that the Commonwealth's failure to

present evidence at trial sufficient to prove beyond a reasonable doubt that he in fact lacked either an FID card or a license to carry a firearm was inconsistent with the maxim intoned in Winship. See Pet'r's Mem. 15.

This Court disagrees, although on somewhat different grounds than those furnished by the Supreme Judicial Court. In arriving at the conclusion that Powell bore the burden of producing evidence of an FID card and a license to carry, the Supreme Judicial Court primarily relied upon its earlier decision in Commonwealth v. Jones, 372 Mass. 403 (1977), Powell, 459 Mass. at 582, which involved a defendant's challenge to a conviction under Massachusetts General Laws chapter 269, section 10(a) for carrying a firearm without a license. In Jones, the prosecution put on sufficient evidence to prove that the defendant possessed a loaded handgun while sitting in his vehicle but did not provide any evidence tending to show that the defendant was not licensed to carry such a weapon. 372 Mass. at 404. Nevertheless, the trial judge in the case informed the jury about the Massachusetts General Laws chapter 278, section 7 presumption and, following deliberation, the jury returned a verdict of guilty. Id. After reviewing the interpretation of Massachusetts General Laws chapter 278, section 7 in other jurisprudential contexts and the interaction of that provision with others comprising Massachusetts's firearms regulatory scheme, the court ruled:

11

We hold that [Massachusetts General Laws chapter 278, section 7], establishing a presumption that the defendant, until he proves a license, is not so authorized, is constitutional. . . .

. . . .

The holding of a valid license brings the defendant within an exception to the general prohibition against carrying a firearm, and is an affirmative defense. Absence of a license is not "an element of the crime," as that phrase is commonly used.  In the absence of evidence with respect to a license, no issue is presented with respect to licensing.  In other words, the burden is on the defendant to come forward with evidence of the defense.  If such evidence is presented, however, the burden is on the prosecution to persuade the trier of facts beyond a reasonable doubt that the defense does not exist.[8]

Id. at 404, 406 (footnote omitted) (citation omitted).

Much confusion stems from Jones's muddled rationale for upholding Massachusetts General Laws chapter 278, section 7.  Put simply, the Jones court's oblique and intermingled references to presumptions, defenses, burdens, and the like "left ambiguity as to whether the licensing requirement was an element of the crime or an affirmative defense."  Gonzalez v. Dickhaut, No. 08-11657, 2010 WL 4955559, at *3 (D. Mass. Nov. 30, 2010) (Zobel, J.). Subsequent cases have largely adopted Jones's rhetoric wholesale, finding no cause to question its vague argument in favor of construing licensure as an affirmative defense to the otherwise

---

[8] The Supreme Judicial Court has since held that Jones's reasoning regarding licenses to carry firearms applies equally to FID cards as well.  See Commonwealth v. Colon, 449 Mass. 207, 225-26 (2007).

12

unlawful possession or carrying of a firearm.  See, e.g., Burke
v. Spencer, No. 05-12266-DPW, 2011 WL 5882183, at *5 (D. Mass.
Nov. 23, 2011) (Woodlock, J.); Eberhart, 461 Mass. at 813.
Courts that have contemplated the essential ingredients
comprising the crimes of unlawful possession and carrying of a
firearm have typically identified only two elements: (1) the
knowing possession of a weapon (2) that meets the statutory
definition of a firearm.  See, e.g., Commonwealth v. Gouse, 461
Mass. 787, 803 n.17 (2012); Commonwealth v. Johnson, 461 Mass.
44, 52-53 (2011); Commonwealth v. Young, 453 Mass. 707, 713 n.9
(2009).

        Yet these interpretations defy the plain reading of both the
relevant firearms statutes and Powell's criminal complaint,[9]
whose very text make clear that it is the possession or carrying
of a firearm without a license that constitutes the essential
element of the crimes codified in Massachusetts General Laws
chapter 269, section 10(a) and (h).  See Mass. Gen. Laws ch. 269,
§ 10(h)(1) (making criminally culpable anyone who "owns [or]
possesses . . . a firearm . . . without complying with the
provisions of [Massachusetts General Laws chapter 140, section

_____

        [9] An indictment (which may take the form of a criminal
complaint or other accusatory instrument) must, in its
allegations, abide by the governing due-process principle set
forth in Winship.  See Apprendi v. New Jersey, 530 U.S. 466, 500
(2000) (Thomas, J., concurring); Almendarez-Torres v. United
States, 523 U.S. 224, 228 (1998).

                                    13

129C]," id. (emphasis added), which proscribes such ownership and possession "unless [one] has been issued a[n] [FID] card," Mass. Gen. Laws ch. 140, § 129C (emphasis added)); id. § 10(a)(2) (making criminally culpable anyone who "knowingly has in his possession . . . a firearm, loaded or unloaded . . . without . . . having in effect a license to carry firearms" (emphases added)); Supplemental Answer 97 (recording the offenses with which Powell was charged as, inter alia, "Firearm Without FID Card, Possess c269 s.10(h)" and "Firearm, Carry Without License c269 s.10(a)" (emphases added)).  The Supreme Judicial Court itself has at one time or another endorsed such an understanding. See Commonwealth v. Alvarado, 423 Mass. 266, 269 (1996) ("Carrying a gun is not a crime.  Carrying a firearm without a license (or other authorization) is."); Commonwealth v. Nowells, 390 Mass. 621, 627 (1983) ("The ownership or possession of a handgun . . . is not a crime.").

Thus, this Court rejects the reasoning adduced in Jones with respect to criminal elements and holds instead that the absence of a license, specifically as applied to the crimes of unlawful possession of a firearm and unlawful carrying of a firearm, cannot properly be styled an affirmative defense.  Rather, the legally operative elements of the two offenses under review are, respectively, (1) the possession or ownership (2) of a firearm (3) without an FID card; and (1) the knowing (2) carrying (3) of

14

a firearm (4) without a license to carry said firearm.  Cf.
Gonzalez, 2010 WL 4955559, at *3 (questioning Jones's wisdom and
taking an analogous tack in construing the elements of the crime
of possession of ammunition without an FID card as "(1)
possession (2) of ammunition (3) without a[n] [FID] card").

The fact that the Supreme Judicial Court in Powell deployed
Jones's misdirected logic with regard to the criminal elements of
the Massachusetts firearms offenses under review does not
necessarily mean that the court's reasoning as a whole was
contrary to Supreme Court law, however.  Indeed, the majority of
the Powell court's discussion dealt with the allocations of
burdens, see 459 Mass. at 582, which also formed the chief
concern of the court in Jones, see Commonwealth v. Couture, 407
Mass. 178, 182 (1990).  Whether the burden-shifting presumption
in Massachusetts General Laws chapter 278, section 7 may be
allowed to stand, however, depends on whether it can survive
constitutional scrutiny.

The test for determining the validity of statutory
presumptions comes from Tot v. United States, 319 U.S. 463
(1943).  For a presumption to withstand a court's inquiry, "a
rational connection between the facts proved and the fact
presumed" must exist, and the defendant must have the
"comparative convenience of producing evidence of the ultimate
fact" at issue.  Id. at 467.  In County Court of Ulster County v.

15

Allen, 442 U.S. 140 (1979), the Supreme Court further subdivided statutory presumptions into two distinct types of evidentiary devices: permissive presumptions and mandatory presumptions. Permissive presumptions "allow[] -- but do[] not require -- the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and . . . place[] no burden of any kind on the defendant." Id. at 157. A permissive presumption will be held to be devoid of constitutional validity only if "there is no rational way the trier could make the connection permitted by the inference." Id. Mandatory presumptions, by contrast, are "far more troublesome" because they "tell[] the trier that he or they must find the elemental fact upon proof of the basic fact, at least unless the defendant has come forward with some evidence to rebut the presumed connection between the two facts." Id. Consequently, such presumptions are generally accorded a fair degree of hostility. C.f., e.g., Sandstrom v. Montana, 442 U.S. 510, 520-24 (1979) (holding that a jury instruction stating that "the law presumes a person intends the ordinary consequences of his voluntary acts," id. at 512 (internal quotation marks omitted), violated a defendant's due process rights, id. at 520-24); Mullaney v. Wilbur, 421 U.S. 684, 703 (1975) (striking down as unconstitutional a state law requiring jurors to conclusively imply a murder defendant's guilt unless the defendant could show by a preponderance of the

evidence that his actions were the result of sudden provocation). A special exception is made, however, for those mandatory presumptions that "merely shift the burden of production to the defendant, following the satisfaction of which the ultimate burden of persuasion returns to the prosecution." Allen, 442 U.S. at 157 n.16. Where the burden of production may be satisfied by an exceptionally low showing of evidence, the impact of such nominally mandatory burdens "may well be . . . no greater than [those] of . . . permissive inference[s], and it may be proper to analyze [them] as such." Id.

In determining whether a presumption may be accurately characterized as permissive or mandatory, "the jury instructions will generally be controlling, although their interpretation may require recourse to the statute involved and the cases decided under it." Id. Because nothing in the record elucidates the instructions given to the jury in Powell's trial, this Court is compelled to appeal to Massachusetts General Laws chapter 278, section 7 itself and to its common understanding in the case law. The language employed in the statute substantiates Powell's attestation that the statutory presumption is mandatory and not permissive. See Mass. Gen. Laws ch. 278, § 7 (directing that, unless one charged with unlawfully engaging in an activity requiring licensure provides evidence of a license, "the presumption shall be that he is not so authorized" (emphasis

17

added)).  Powell appears, however, to misunderstand that the so-called "burden" of proof is actually the composite of two distinct and constituent burdens: the burden of persuasion and the burden of production.  Steven I. Friedland et al., Evidence Law and Practice § 17.04, at 724 (2d ed. 2004).  The former relates specifically to "which party loses if the evidence is closely balanced," while the latter relates merely to "which party bears the obligation to come forward with the evidence at different points in the proceeding."  Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 56 (2005).  A close reading of the language in Massachusetts General Laws chapter 278, section 7 confirms that the statute operates only to shift the burden of production onto the defendant.  In stating that "[a] defendant in a criminal prosecution, relying for his justification upon a license, . . . shall prove the same," Mass. Gen. Laws ch. 278, § 7 (emphasis added), the statute explicitly requires a defendant to offer proof of a license to partake in a restricted activity.  The statute does not demand that the defendant herself prove to a jury that she did not partake in the restricted activity without a license, as such a requirement would in fact be violative of due process.  The jurisprudence of Massachusetts's own federal and state courts gives weight to this Court's interpretation of Massachusetts General Laws chapter 278, section 7's burden-shifting provision.  See Couture, 407 Mass. at 182 (seeking to

18

resolve the uncertainty persisting in Jones's wake by postulating that the burden to which the Jones court referred was that of production, not of proof); cf. Gonzalez, 2010 WL 4955559, at *3 (holding with respect to the crime of possession of ammunition without an FID card that although the prosecution bears the burdens of production and persuasion as to the defendant's possession of ammunition, the defendant "bears the burden of production and perhaps [persuasion] as to the [FID] card").

Because the burden of production may be met by a minimal showing -- that is, the mere production of a license -- the mandatory presumption in Massachusetts General Laws chapter 278, section 7 may be assessed under the standard governing permissive presumptions.  See Allen, 442 U.S. at 157 n.16.  One can rest assured that where the existence of a license is squarely within the knowledge of the defendant and the demonstration of proof to that effect imposes upon the defendant no cognizable hardship, any reasonable trier of fact could indeed ascertain a rational connection between the facts proved (the possession and carrying of a firearm) and the fact presumed (the absence of a license).[10]

---

[10] Obviously, "the fact that the defendant has the better means of information, standing alone, [does not] justify the creation of such a presumption," Tot, 319 U.S. at 469, and it may in fact be the case that in this age of electronic record-keeping, the Commonwealth is equally positioned to verify a defendant's status regarding firearms licensure.  Regardless, the Supreme Court has held that, as between the rational-connection and comparative-convenience prongs of the Tot test, "the first is controlling and the second but a corollary."  Id. at 467.

Compare Couture, 407 Mass. at 182 (remarking that the
Commonwealth need not present evidence to prove the absence of a
license to carry a firearm "[w]here the defendant at trial has
had every opportunity to respond to the Commonwealth's charge
that the defendant was unlawfully carrying a handgun, where the
defendant need only produce that slip of paper indicating that he
was licensed to carry that gun, and where instead the defendant
produces no evidence to that effect"), with Gonzalez, 2010 WL
4955559, at *4-6 (holding that the compulsion of a joint venturer
to produce the FID card of another criminal party in order to
shift the burden of proof on a charge of unlawful possession of
ammunition contravened the joint venturer's due process rights),
and Commonwealth v. Farley, 64 Mass. App. Ct. 854, 862 (2005)
(ruling that a defendant charged with unlawful possession of a
firearm met his burden of production where he provided sufficient
evidence "that his license to carry . . . had expired . . .; that
as of the date of his arrest . . ., he had not received notice
that his license to carry had been revoked, suspended, or denied;
and that he had not submitted a renewal application").

     At trial in the case at bar, the Commonwealth had to offer
up only enough evidence for a rational jury to find beyond a
reasonable doubt that Powell possessed a firearm and knowingly
carried it beyond the walls of his home or place of business.
This it did.  See Pet'r's Mem. 15.  Powell, however, did not at

any time before or during trial produce either an FID card or a
license to carry, so as matter of law, he has failed to raise a
triable issue.  Accordingly, this Court holds that the placement
of the burden of production on Powell to provide such evidence
did no violence to his due process rights under the Fourteenth
Amendment.

### 2.    Second Amendment

The Supreme Judicial Court declined to consider Powell's
properly raised claim regarding the constitutionality of
Massachusetts General Laws chapter 278, section 7 in light of the
Supreme Court's decisions in <u>District of Columbia</u> v. <u>Heller</u>, 554
U.S. 570 (2008), and <u>McDonald</u> v. <u>City of Chicago</u>, 130 S. Ct. 3020
(2010).  This Court therefore undertakes a review of this claim
de novo.  <u>See</u> <u>Watkins</u> v. <u>Murphy</u>, 292 F.3d 70, 75-76 (1st Cir.
2002).

The Second Amendment, by its terms, provides a powerful
(albeit concise) constitutional guarantee: "A well regulated
Militia, being necessary to the security of a free State, the
right of the people to keep and bear Arms, shall not be
infringed."  U.S. Const. amend. II.  In <u>Heller</u>, the Supreme Court
struck down a provision in the District of Columbia Official Code
barring the possession of lawfully owned and operable handguns in
the home.  554 U.S. at 635.  In so doing, the Court clarified
that an individual's right to maintain arms at her residence for

the purpose of protecting herself, her family, or her property is wholly secured by the Second Amendment.  Id. at 628.  Just two years later, in McDonald, the Supreme Court further expanded the bounds of the Second Amendment, holding that the right to keep and bear arms applies to state gun control regulation via the Due Process Clause of the Fourteenth Amendment.  130 S. Ct. at 3050 (plurality opinion).

Powell argues that the Second Amendment, as defined in Heller and McDonald, renders Massachusetts General Laws chapter 278, section 7 unconstitutional because the latter statute "creates a mandatory presumption that knowing possession of a firearm is unlawful."  Pet'r's Mem. 20.  Yet the Heller Court itself acknowledged that the right to keep and bear arms "is not unlimited."  554 U.S. at 626.  To illustrate its point, the Court offered a series of examples in which an individual's Second Amendment right may justifiably be cabined:

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

Id. at 626-27.  The Court made sure to note that the examples it provided did not form an exclusive list of the classes of persons and activities subject to states' regulatory authority.  Id. at 627 n.26.  Justice Alito's plurality opinion in McDonald left

22

undisturbed Heller's premise that the right to keep and bear arms
may in certain instances be constrained, concluding that
"[d]espite . . . doomsday proclamations, incorporation does not
imperil every law regulating firearms." 130 S. Ct. at 3047
(plurality opinion). Therefore, in order to prevail on this
ground for relief, Powell must demonstrate that the firearms
licensing scheme at issue works mischief by circumscribing
unreasonably the Second Amendment rights of gun owners.

It is well settled that "the requirement of prior approval
by a government officer, or a licensing system, does not by
itself render [a firearms] statute unconstitutional on its face."
Loadholt, 460 Mass. at 726 (2011) (internal quotation marks
omitted). A challenged firearms licensing statute is generally
believed to be valid unless its implementation can be shown to be
arbitrary and capricious. Cf. Godfrey v. Chief of Police of
Wellesley, 35 Mass. App. Ct. 42, 46 (1993) (reviewing the
revocation of the plaintiff's license to carry a firearm and
ruling that "[w]hen the license is either not granted or not
renewed, the applicant is entitled to relief . . . only upon a
showing by the applicant that the licensing authority's refusal
. . . was arbitrary, capricious, or an abuse of discretion."
(quoting Chief of Police of Shelburne v. Moyer, 16 Mass. App. Ct.
543, 546 (1983)) (internal quotation marks omitted)). Powell,
however, advances no such claim and thus cannot make such a

showing.  The Supreme Court, on the other hand, has exhibited a
rather favorable posture toward licensure, especially when the
practice is used to moderate law and order.  See, e.g., Heller,
554 U.S. at 626-27 (dubbing "laws imposing conditions and
qualifications on the commercial sale of arms" presumptively
valid); cf., e.g., Cox v. New Hampshire, 312 U.S. 569, 574 (1941)
(explaining, in the dismissal of five Jehovah's Witnesses' First
Amendment challenge to convictions stemming from organizing a
parade in a public street without a license, that "[t]he
authority of a municipality to impose regulations in order to
assure the safety and convenience of the people in the use of
public highways has never been regarded as inconsistent with
civil liberties but rather as one of the means of safeguarding
the good order upon which they ultimately depend").  In this way,
the Supreme Court has suggested that it is perhaps more
appropriate to conceive of the right to keep and bear arms as a
limited "property right" rather than as an unlimited "primary
right."  See Warren Freedman, The Privilege to Keep and Bear Arms
69 (1989) ("[T]he right to keep and bear arms is not a primary
right like freedom of speech that must be protected at all
cost. . . . [T]he states have been content to legislate control
over the 'property' of the firearms, even though possession of
arms is admittedly not valued as an end in itself.  Self-defense
and security of person, home, and property are the primary

rights, but these ends can be achieved without dependence upon the possession of a gun."). Absent evidence to the contrary, this Court is inclined to presume that the Commonwealth's regulation of firearms by means of a comprehensive licensing scheme falls within the band of governmental action allowable under the Second Amendment.[11] Consequently, this Court holds that the imposition of licensure as a predicate to possessing and carrying a firearm in the Commonwealth does not vitiate Powell's core Second Amendment right to keep and bear arms.[12]

---

[11] Indeed, Heller itself presumed as much with regard to the licensing scheme discussed in that case. See 554 U.S. at 635 ("Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home."). Even those in the Founding Era found certain conditions attendant to gun ownership permissible. See Don B. Kates, Jr., Handgun Prohibition and the Original Meaning of the Second Amendment, 82 Mich. L. Rev. 204, 265-66 (1984) (observing that, under colonial and early republican militia laws, every able-bodied adult male was required to maintain arms and submit them for inspection on a periodic basis).

[12] This Court notes the ostensible inconsistency of Heller with the Supreme Judicial Court's position in Jones that "[t]he holding of a valid license brings the defendant within an exception to the general prohibition against carrying a firearm." 372 Mass. at 406 (emphasis added). Yet as mentioned above, Heller only recognized a right of individuals to possess firearms in their homes. 554 U.S. at 635. Although some courts have held that the Second Amendment applies with equal force to the carrying of firearms outside of the home, see, e.g., Moore v. Madigan, 702 F.3d 933, 935-36 (7th Cir. 2012), United States v. Masciandaro, 638 F.3d 458, 467-68 (4th Cir. 2011) (opinion of Niemeyer, J.), the First Circuit has declined to make a determination one way or the other, Hightower v. City of Bos., 693 F.3d 61, 72 n.8 (1st Cir. 2012). Regardless, even if the First Circuit or the Supreme Court were eventually to extend such protections to the carrying of firearms, this activity would

25

### C.    Ineffective Assistance of Counsel

Officer Blas testified at trial that, immediately after apprehending Powell, he asked Powell why he fled when he spotted the police cruiser and whether he possessed a license for the firearm that he dropped while being pursued.  <u>Powell</u>, 459 Mass. at 582.  Powell's response was that he did not have a firearm. <u>Id.</u>  Neither Officer Blas nor Officer Roby gave Powell notice of his <u>Miranda</u> rights.  <u>Id.</u>  In the run-up to trial, Powell's trial counsel filed a motion to suppress physical evidence recovered from the site of Powell's arrest but did not file a similar motion to suppress the statement he had made to Officer Blas. Pet'r's Mem. 18; Resp't's Mem. 10.  Powell asserts that his trial counsel's failure to move to suppress evidence of this statement constituted a violation of his Sixth Amendment right to effective assistance of counsel and that, had the statement been excluded from evidence, a reasonable jury would have returned a verdict in his favor.  Pet'r's Mem. 17-19.

Powell again requests de novo review.  He argues that the Supreme Judicial Court "completely skipped the merits" of his ineffective-assistance-of-counsel claim and that, as a result, "there is no res judicata effect triggering deference [to the Supreme Judicial Court's decision]."  <u>Id.</u> at 9.

---

likely still be subject to certain limitations, as <u>Heller</u> so described.

This argument, however, is plainly incorrect.  The Supreme
Judicial Court, in assessing the strength of Powell's Sixth
Amendment claim, employed the standard set out in its earlier
decision in Commonwealth v. Saferian, 366 Mass. 89 (1974).  Under
Saferian, Massachusetts courts entertaining petitions for habeas
relief are directed to engage in "a discerning examination and
appraisal of the specific circumstances of the given case to see
whether there has been serious incompetency, inefficiency, or
inattention of counsel . . . and, if that is found, then,
typically, whether it has likely deprived the defendant of an
otherwise available, substantial ground of defence."  Id. at 96.
The First Circuit has held Saferian's version of the ineffective-
assistance-of-counsel standard to be coterminous with the one
announced by the Supreme Court in Strickland v. Washington, 466
U.S. 668 (1984), at least for the purposes of habeas.  Ouber v.
Guarino, 293 F.3d 19, 32 (1st Cir. 2002).  In Powell, the Supreme
Judicial Court concluded that counsel's failure to file a motion
to suppress the statement Powell made to Officer Blas regarding
whether he had a firearm "did not likely deprive him of 'an
otherwise available, substantial ground of defence,'" 459 Mass.
at 583 (quoting Saferian, 366 Mass. at 96), because the statement
served only to supplement other convincing evidence of Powell's
guilt and because Powell carried the burden of producing an FID
card upon request, id.  "Because the Strickland test qualifies as

27

'clearly established Federal law, as determined by the Supreme
Court of the United States,'" <u>Williams</u> v. <u>Taylor</u>, 529 U.S. 362,
391 (2000), the Supreme Judicial Court's decision to reject
Powell's claim for ineffective assistance of counsel under
<u>Saferian</u> did not run afoul of AEDPA.

That said, although the reasoning of the Supreme Judicial
Court is eminently sensible, this Court wishes to take the
opportunity here to spell out additional reasons -- made with
express reference to <u>Strickland</u> and its progeny in the federal
courts -- why Powell's claim for ineffective assistance fails.
To prevail on a claim of ineffective assistance of counsel under
<u>Strickland</u>, a defendant must demonstrate that "counsel's
representation fell below an objective standard of
reasonableness" and that the deficiency in representation was
"prejudicial to the defense."  466 U.S. at 688, 692.  Because
"the Constitution pledges to an accused an <u>effective</u> defense, not
necessarily a perfect . . . or a successful defense," courts owe
to counsel a measure of deference in their representation of
clients.  <u>Scarpa</u> v. <u>Dubois</u>, 38 F.3d 1, 8 (1st Cir. 1994)
(emphasis added).  In particular, counsel's failure to file a
motion to suppress evidence "does not constitute <u>per se</u>
ineffective assistance of counsel."  <u>Kimmelman</u> v. <u>Morrison</u>, 477
U.S. 365, 384 (1986).  Rather, where the particular basis for a
claim of ineffective assistance stems from counsel's failure to

file a suppression motion, "[t]he defendant must show that the constitutional claim has merit and that there was a reasonable possibility that the verdict would have been different without the excludable evidence." Barry v. Ficco, 392 F. Supp. 2d 83, 94 (D. Mass. 2005) (quoting Commonwealth v. Anderson, 58 Mass. App. Ct. 117, 127-28 (2003)) (internal quotation marks omitted).

Whether Powell's trial counsel's failure to file a suppression motion to exclude Powell's statement to Officer Blas constituted a lapse in professional judgment is a matter of debate; regardless, it is clear that the trial counsel's actions were situated comfortably within the bounds of an objective standard of reasonableness.  Choices made by counsel in regard to litigation strategy are presumed to "fall[] within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.  As a result, these choices are deemed "virtually unchallengeable" by courts when "made after thorough investigation of law and facts relevant to plausible options," id. at 690, and are often accepted even absent thorough investigation "to the extent that reasonable professional judgments support the limitations on investigation," id. at 691. Although the Supreme Judicial Court did not explore whether (and, if so, the extent to which) Powell's trial counsel's failure to file a suppression motion was the product of sensible, carefully crafted lawyering, Powell cannot prevail on a claim of

29

ineffective assistance merely by drawing unsupported inferences to the contrary. See United States v. Crosby, No. 11-1951, 2012 WL 4827872, at *1 (1st Cir. Oct. 11, 2012) (per curiam) (noting that where the record is unclear as to counsel's particular reasons for failing to file a suppression motion, speculative assumptions regarding counsel's competency are by themselves insufficient to implicate the Sixth Amendment).  Rather, the very fact that Powell's trial counsel filed a motion to suppress physical evidence recovered at the site of Powell's arrest reflects at least a modicum of tactical decisionmaking on his part.  See, e.g., Moore v. Florida, No. 2:07-cv-80-FtM-36DNF, 2010 WL 3833953, at *14 (M.D. Fla. Sept. 28, 2010) (rejecting a claim that counsel's performance was ineffective because, inter alia, "the trial transcript refute[d] Petitioner's allegations that counsel failed to file any pre-trial motions"); cf. Kimmelman, 477 U.S. at 385 (holding that counsel's failure to file a suppression motion constituted ineffective assistance because counsel had not conducted any pretrial discovery in the case).  Powell has not shown his Sixth Amendment claim to be meritorious, and as a result, it fails on this ground alone.

Even if this Court were to grant Powell's proposition that his trial counsel's failure to file a motion to suppress the statement made to Officer Blas fell below a standard of objective reasonableness, Powell has not shown that such an error rises to

the level of prejudice.  In his memorandum in support of his
habeas petition, Powell relies heavily upon Commonwealth v.
Haskell, 438 Mass. 790 (2003), in which the Supreme Judicial
Court held that a police officer's mere request that a suspect in
custody furnish a license for a firearm must be preceded by a
Miranda warning and that, if a Miranda warning is not given, any
response provided by the suspect constitutes a testimonial
communication in breach of the suspect's Fifth Amendment right to
silence and therefore must be suppressed.  Id. at 796-97.  Yet
Haskell is inapposite to the case at bar.  The Haskell court did
not so much as consider the issue of ineffective assistance of
counsel, so it is unclear whether the error in that case may be
rightly attributed to the suspect's presumed counsel or whether
blame may be placed wholly upon the shoulders of the patrolman.
Moreover, the failure to provide a Miranda warning is not
necessarily determinative of prejudice, especially when the
weight of the evidence in the record supports the ultimate
conclusion reached by the jury.  See, e.g., LaFortune v. United
States, No. 03-10366-PBS, 2012 WL 5389909, at *5-8 (D. Mass. Nov.
2, 2012) (Saris, J.) (holding counsel's failure to file a
suppression motion to be deficient where a suspect was
interrogated for nearly two hours before being read his Miranda
rights, id. at *5-8, but nevertheless concluding that the
suspect's admissions to the police were not unduly prejudicial

31

because substantial evidence corroborated his statements, id. at *8,); Sliney v. United States, No. CIVA 05-033 WL, 2006 WL 2642326, at *7-9 (D.R.I. Sept. 12, 2006) (ruling that, although a suspect's response to police inquiry was invalid because it was not given subsequent to a Miranda warning, overwhelming evidence confirmed the suspect's guilt, which meant that the prejudice prong under Strickland had not been satisfied).  In its opinion in Powell, the Supreme Judicial Court noted that aside from Powell's contested statement, Powell's efforts to conceal a firearm, as well as his attempts to evade the attention (and later custody) of the officers, were enough to impute culpability.  459 Mass. at 583.  As a result, there is little possibility that the outcome of Powell's trial would have been different had Powell's statement to Officer Blas been excluded. Accordingly, this Court holds that Powell's claim for ineffective assistance of counsel cannot prevail.

### D.  Age-Based Restrictions on the Issuance of Firearms Licenses

#### 1.  Standing

Massachusetts General Laws chapter 140, sections 129B and 131 set out the requirements for obtaining an FID card and a license to carry a firearm in the Commonwealth, respectively. See Mass. Gen. Laws ch. 140, §§ 129B, 131.  Relevant for the purposes of this inquiry are the provisions of these two statutes that place age-based restrictions on the issuance of FID cards

32

and licenses to carry.  Massachusetts General Laws chapter 140, section 129B(1)(v)-(vi) proscribes the granting of an FID card to children under the age of fifteen and to children between the ages of fifteen and eighteen who have not offered documentation confirming parental or guardian consent to the children's receipt of the card, <u>id.</u> § 129B(1)(v)-(vi), whereas Massachusetts General Laws chapter 140, section 131(d)(iv) disallows the issuance of a license to carry to any person who "is at the time of the application less than 21 years of age," <u>id.</u> § 131(d)(iv).

The Supreme Judicial Court held that Powell lacked standing to bring his Second Amendment and Fourteenth Amendment claims because, prior to his arrest, he had applied for neither an FID card nor a license to carry a firearm.  459 Mass. at 589-91. Specifically, the court declared that Powell "ha[d] not demonstrated that a denial of the issuance of an FID card would have been rendered" at all, <u>id.</u> at 589, and that he "ha[d] not demonstrated that a denial of the issuance of a [license to carry] . . . would have been rendered on account of his age alone," <u>id.</u> at 590.  Powell contends that the Supreme Judicial Court's determination is due no deference under AEDPA because it spoke only to standing.  Pet'r's Mem. 10-11.

His contention is correct.  Because the Supreme Judicial Court did not reach the merits of the constitutional claims raised in Powell's habeas petition, this Court owes its decision

no deference and is at liberty to review this issue de novo. See, e.g., Cone v. Bell, 556 U.S. 449, 472 (2009). Even so, standing may not be assumed arguendo in the instant case, so before proceeding to the heart of Powell's constitutional claims regarding the legality of Massachusetts's age-restricted firearms licensing scheme, this Court must first decide whether it has Article III jurisdiction to hear these claims at all. Cf. Arizonans for Official English v. Arizona, 520 U.S. 43, 66-67 (1997) (holding that the Court may address an argument regarding mootness without first establishing the petitioners' standing to appeal "because the former question, like the latter, goes to the Article III jurisdiction of this Court and the courts below, not to the merits of the case," id. at 67).

In general, a person may establish standing to challenge a firearms licensing statute on constitutional grounds only by first submitting to the statute so challenged. United States v. Decastro, 682 F.3d 160, 164 (2d Cir. 2012); cf. Allen v. Wright, 468 U.S. 737, 746 (1984) (finding that parents of African American children had no standing to challenge the tax-exempt status of allegedly racially discriminatory private schools where the children had never sought admission to said schools and had no intention to do so in the future). An individual's failure to follow statutory procedures does not present a bar to standing, however, if the individual can demonstrate that applying for a

firearms license would have amounted to an exercise in futility. Decastro, 682 F.3d at 164; cf. International Bhd. of Teamsters v. United States, 431 U.S. 324, 365-66 (1977) (noting that minorities need not have formally applied to a company embracing a policy of "Whites Only" to have standing to challenge such a policy).

The Supreme Judicial Court's assessment of Powell's standing to challenge the age-restricted firearms licensing scheme in Massachusetts is erroneous, at least in part.  Powell was eighteen years old at the time he was charged for the offenses underlying his convictions.  See Powell, 459 Mass. at 573 n.2. Although he faced no obstacles to lawfully obtaining an FID card, see Mass. Gen. Laws ch. 140, § 129B(1)(v)-(vi), Powell was statutorily ineligible to apply for a license to carry in Massachusetts, see id. § 131(d)(iv).  Powell need not prove that he would have been denied a license to carry solely on the basis of his age in order to satisfy standing requirements.  Cf. Bach v. Pataki, 408 F.3d 75, 82-83 (2d Cir. 2005) (holding that a Virginia resident and domiciliary need not have applied for a New York handgun license in order to have standing to challenge New York's handgun licensing scheme, which included residence or employment in the state among its application requirements). Adopting the alternative view would simply buck common sense and could, in certain instances, have the deleterious effect of

insulating insufficiently theorized state court decisions from federal habeas review.

Accordingly, this Court holds that, while Powell does not have standing to challenge his conviction under Massachusetts General Laws chapter 269, section 10(h) for possessing a firearm without an FID card, he does indeed have standing to challenge his conviction under Massachusetts General Laws chapter 269, section 10(a) for carrying a firearm without a license.[13]

### 2. Merits

Having held that Powell has standing to challenge Massachusetts's license-to-carry statute, this Court now turns to the merits of his constitutional claims.

As noted above, <u>Heller</u> has now settled the debate over whether there exists an individualized right to keep and bear arms.  Questions remain, however, as to whom the Founders referred when they conferred this fundamental right upon "the people."[14]  Prime among these questions is whether the right to

---

[13] Although this Court need not decide whether the age-based restrictions in Massachusetts General Laws chapter 140, section 129B(1)(v)-(vi) pass muster under the Second and Fourteenth Amendments, were it to do so, the Court would likely answer this question in the affirmative, given the discussion in section II.D.2, <u>infra</u>.

[14] Indeed, another court in this district recently ruled that the Second Amendment swept within its ambit aliens maintaining lawful permanent residency in the United States and, therefore, that a Massachusetts firearms regulation predicating firearm possession upon citizenship was unconstitutional as applied to such persons.  <u>Fletcher</u> v. <u>Haas</u>, 851 F. Supp. 2d 287,

keep and bear arms can be properly said to vest at the age of
eighteen.  Powell, through his petition for a writ of habeas
corpus, grants this Court occasion to answer this particular
question, which gives rise to an issue of first impression in
this circuit.[15]

### a.   Second Amendment

For better or worse, Heller left to the lower courts the
task of establishing coherent analytical frameworks for
determining whether a given firearms regulation runs afoul of the
Second Amendment.  See 554 U.S. at 634.  In the absence of
higher-level guidance, the majority of the courts of appeals have
adopted a two-pronged approach to challenges to firearms
regulations, considering "whether the challenged law imposes a
burden on conduct falling within the scope of the Second
Amendment's guarantee" and, if so, whether it passes "some form

---

288 (D. Mass. 2012) (Woodlock, J.).

[15] The Fifth Circuit was the first of the courts of appeals
to wrestle with the constitutionality of an eighteen- to twenty-
year-old firearms ban since the advent of Heller, recently
holding in National Rifle Ass'n of America, Inc. v. Bureau of
Alcohol, Tobacco, Firearms, and Explosives, 700 F.3d 185 (5th
Cir. 2012), that federal statutes and regulations prohibiting the
sale of handguns by federal firearms licensees to adults under
the age of twenty-one were constitutional under the Second
Amendment and the equal protection component of the Fifth
Amendment.  Id. at 192-212.  Although the facts of National Rifle
Ass'n differ slightly from those in the instant case, the
arguments entertained are analogous and the reasoning sound.  As
a result, this Court relies upon the Fifth Circuit's detailed
decisional analysis as a model, and by virtue of this dependence,
treads some of the same ground.

of means-end scrutiny." <u>United States</u> v. <u>Marzzarella</u>, 614 F.3d
85, 89 (3d Cir. 2010); <u>accord</u> <u>National Rifle Ass'n of Am., Inc.</u>
v. <u>Bureau of Alcohol, Tobacco, Firearms, and Explosives</u>, 700 F.3d
185, 194 (5th Cir. 2012); <u>GeorgiaCarry.Org, Inc.</u> v. <u>Georgia</u>, 687
F.3d 1244, 1260 n.34 (11th Cir. 2012); <u>United States</u> v. <u>Greeno</u>,
679 F.3d 510, 518 (6th Cir. 2012); <u>Heller</u> v. <u>District of</u>
<u>Columbia</u>, 670 F.3d 1244, 1252 (D.C. Cir. 2011); <u>Ezell</u> v. <u>City of</u>
<u>Chicago</u>, 651 F.3d 684, 702-03 (7th Cir. 2011); <u>United States</u> v.
<u>Chester</u>, 628 F.3d 673, 680 (4th Cir. 2010); <u>United States</u> v.
<u>Reese</u>, 627 F.3d 792, 800-01 (10 Cir. 2010).  This Court joins
these circuits and adopts the aforementioned two-pronged
approach.

### i.   Scope of the Second Amendment Guarantee

The first question to be addressed in this inquiry is
whether the age-based limitation on a license to carry in
Massachusetts imposes a burden on conduct falling within the
scope of the Second Amendment guarantee.

Firearms regulations have a deep and rich heritage in this
country, with a lineage that can be traced back before the
Founding Era.[16]  For example, during the seventeenth and

---

[16] Such regulations likely find their beginnings in the
traditions of medieval England.  <u>See</u> Patrick J. Charles, Essay,
<u>Scribble Scrabble, the Second Amendment, and Historical</u>
<u>Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee</u>
<u>Malcolm</u>, 105 Nw. U. L. R. 1821, 1822-23 (2011) (detailing various
limitations imposed by Kings Alfred, Edward III, and Henry VIII

eighteenth centuries, colonial legislatures, in response to the exigencies of public emergency, exercised their police powers to impress privately owned weapons.  Robert H. Churchill, <u>Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment</u>, 25 Law & Hist. Rev. 139, 151-53 (2007); <u>see also</u> Adam Winkler, <u>Gunfight</u> 113-14 (2011).  Relatedly, pursuant to militia laws in effect at the time, able-bodied adult males were required to submit their firearms on periodic bases for government inspection.  Saul Cornell & Nathan DeDino, <u>A Well Regulated Right: The Early American Origins of Gun Control</u>, 73 Fordham L. Rev. 487, 510 (2004).  In addition, numerous states had on their books laws governing the safe handling and storage of gunpowder, which included volume limitations and regulations dictating exactly where in one's home such ammunition could be kept.  <u>Id.</u> at 510-11.

Of particular import to the case at bar, however, are those regulations targeting groups of otherwise law-abiding people who were thought to be dangers to public safety.  Fearful of the

---

regarding whether, where, and how certain contemporaneous weapons could lawfully be possessed); Freedman, <u>supra</u>, at 43 (referring to a variety of weapons regulations enforced during the Middle Ages, including prohibitions on Jewish possession of coats of mail and breastplates, limitations on riding in public while armed, and the authority of the king to search the homes of individuals assumed to be dangerous and to seize any arms therein).

threat that Crown-beholden colonists posed to the ultimate success of the American Revolution, numerous states, including Massachusetts, enacted statutes requiring weapons owners to pledge their allegiance to their state of citizenship and the United States or else face the consequence of disarmament. <u>Id.</u> at 506-07; <u>see also</u> Winkler, <u>supra</u>, at 116 ("The Loyalists disarmed by these rules . . . weren't criminals or traitors who took up arms on behalf of the British.  They were ordinary citizens exercising their fundamental right to freedom of conscience.").  During and preceding the early years of the republic, the ability of slaves to own and carry weapons was severely constrained, <u>see</u> Clayton E. Cramer, <u>The Racist Roots of Gun Control</u>, Kan. J.L. & Pub. Pol'y, Winter 1995, at 17, 17-18 ("Restrictions on slave possession of arms in the North American English colonies go back a very long way . . . ."  <u>Id.</u> at 18), as was those of free blacks, mulattoes, and Native Americans, <u>see, e.g.,</u> Cornell & DeDino, <u>supra</u>, at 516 (identifying an 1806 Virginia law making it mandatory for all free blacks and mulattoes to obtain licenses in order to possess and carry guns or ammunition); Thomas N. Ingersoll, <u>Free Blacks in a Slave Society: New Orleans, 1718-1812</u>, 48 Wm. & Mary Q. 173, 198 (1991) (reporting efforts by the Louisiana Superior Council during the early 1800s "to exclude free blacks from positions in which they were required to bear arms," which included "attempt[s] to

demobilize the black militia . . . [and] to replace the old black slave-catching crews with a white constabulary"); cf., e.g., Robert J. Cottrol & Raymond T. Diamond, The Second Amendment: Toward an Afro-Americanist Reconsideration, 80 Geo. L.J. 309, 323-324 (1991) ("For the settlers of British North America, an armed and universally deputized white population was necessary not only to ward off dangers from the armies of other European powers, but also to ward off attacks from the indigenous population which feared the encroachment of English settlers on their lands."). When one accounts for the fact that the number of minorities and Loyalists in America far exceeded that of whites at the time, it becomes clear that, at least according to historical understandings, only a few select members of society could fully enjoy their right to keep and bear arms. See Winkler, supra, at 116. While the Court recognizes and denounces the xenophobic and bigoted beliefs informing these practices, it is nevertheless evident from a review of the historical record that classification-based limitations on access to firearms for the purpose of ensuring public safety were commonplace in the early republic.

Classification-based firearms regulations persisted well beyond the Founding Era, although state legislatures moved away from their predominant preoccupation with the perils of race and national allegiance to consider those associated with youth. By

41

the turn of the twentieth century, nearly twenty states had laws restricting the ability of persons under the age of twenty-one to access firearms, and over the course of the next twenty or so years, this number steadily grew.  See National Rifle Ass'n, 700 F.3d at 202 & nn.14-16.  Case law from jurisdictions across the country confirms that during the late nineteenth and early twentieth centuries, minors' capacity to purchase and own firearms was significantly curtailed.  See United States v. Rene E., 583 F.3d 8, 14-15 (1st Cir. 2009), cert. denied, 130 S. Ct. 1109 (2010) (compiling cases).  This was at a time when the term "minor" generally applied to individuals under the age of twenty-one, not eighteen.  See Larry D. Barnett, The Roots of Law, 15 Am. U. J. Gender Soc. Pol'y & L. 613, 681-86 app. (2007) (reporting that the age of majority remained twenty-one in most states until the 1970s).  Today, all fifty states in the Union, as well as the District of Columbia, feature laws imposing age-based restrictions of firearms, and many of these laws set the minimum age for the possession and use of firearms at twenty-one.[17]  National Rifle Ass'n, 700 F.3d at 190 n.4 (collecting statutes).

---

[17] What is more, Congress even once considered enacting a bill that would raise the age of eligibility for possessing a handgun to twenty-one, see Youth Gun Crime Enforcement Act of 1999, H.R. 1768, 106th Cong. § 201 (1999), but for reasons unknown to this Court, the effort was abandoned on the floor of the House of Representatives.

The facts evinced from this quick jaunt through history establish that certain access-limiting conditions were and may lawfully be imposed upon individuals seeking to own and use firearms.  Age-based restrictions, enacted for reasons of public safety, are among those lawful impositions.  Accordingly, this Court holds as matter of law that Massachusetts General Laws chapter 140, section 131(d)(iv)'s proscription against grants of licenses to carry firearms to adults under the age of twenty-one comports with the Second Amendment and imposes no burden on the rights of eighteen- to twenty-year-olds to keep and bear arms.[18]

---

[18] The foregoing survey of classification-based restrictions suffices to satisfy the first prong of the analytical framework employed by the Court.  Nevertheless, for Powell's edification, the Court will address the four primary arguments Powell puts forth in support of his proposition that the right to keep and bear arms must extend to those between the ages of eighteen and twenty.

First, Powell argues that eighteen- to twenty-year-olds ought be permitted to possess and carry firearms by virtue of the fact that they are legally compelled to do so when country so demands.  Pet'r's Mem. 27-29.  For proof, Powell makes reference to the Militia Act of 1792 ("Militia Act"), ch. 33, 1 Stat. 271, which required in relevant part that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years . . . shall severally and respectively be enrolled in the militia" and that "every citizen so enrolled . . . shall . . . provide himself with a good musket or firelock . . . and shall appear so armed, accoutred and provided, when called out to exercise, or into service."  Id. § 1, 1 Stat. at 271.  This evidence is ultimately unpersuasive, however.  The minimum age for militia service varied wildly across the colonies and early states, ranging from as low as sixteen to as high as twenty-one.  See, e.g., Act of June 24, 1786, § 2, 1786 N.H. Laws 407, 407 (sixteen); Act of June 2, 1779, ch. 24, § 3, 1778 N.J. Laws 58, 59 (twenty-one); Act of Apr. 3, 1778, ch. 33, 1777 N.Y. Laws 62, 62 (sixteen); Act of

Mar. 26, 1784, 1784 S.C. Acts 68, 69 (eighteen); Act of 1757, ch.
1, § 2, 1756-1761 Va. Acts 334, 334 (eighteen).  In the
Commonwealth's own colonial predecessor, known while under the
dominion of the British Empire as the Province of the
Massachusetts Bay, the age for militia service was under
eighteen.  See Act of Jan. 22, 1776, ch. 10, § 2, 1775-1776 Mass.
Acts 445, 445 (setting the age for militia service at sixteen).
Given the lack of conformity among states with respect to the age
of militia service, the Court finds preposterous the notion that
the Militia Act fixed the minimum age for firearms use at
eighteen.  (Powell additionally relies upon some of the
amendments to the Militia Act, see Pet'r's Mem. 28-29, including
one which lowered the age of militia service to seventeen, Act of
Aug. 10, 1956, ch. 1041, § 311(a), 70A Stat. 14, 14 (codified as
amended at 10 U.S.C. § 311(a)).  The claims founded upon these
amendments, however, fail for the same reasons as do those that
related to the original Militia Act.)  Moreover, even if this
Court were to reject the evidence in the historical record and
accept Powell's premise, Powell ignores the fundamental fact that
"the right to arms is not co-extensive with the duty to serve in
the militia."  National Rifle Ass'n, 700 F.3d at 204 n.17 (citing
Heller, 554 U.S. at 589-94).

     Second, Powell contends that "[t]he clear line of eighteen
as the age of majority applies equally to the exercise of Second
Amendment rights."  Pet'r's Mem. 30; see also id. at 28-29
(citing various contexts in which eighteen is deemed the age of
majority).  It is true that eighteen-year-olds enjoy a host of
privileges and obligations under both federal and Massachusetts
law, not the least of which pertain to marriage, see, e.g., Mass.
Gen. Laws ch. 207, §§ 7, 24-25 (setting the minimum marriageable
age at eighteen years, with certain exceptions made for
qualifying minors), military service, see, e.g., Selective
Service Act of 1948, ch. 625, § 3, 62 Stat. 604, 605 (codified as
amended at 50 U.S.C. App. § 453(a)) (compelling "every male
citizen of the United States, and every other male person
residing in the United States, . . . between the ages of eighteen
and twenty-six" to register for the Selective Service System),
jury service, see, e.g., Mass. Gen. Laws ch. 234A, §§ 3-4
(requiring Massachusetts residents between the ages of eighteen
and sixty-nine to sit on a jury when called by the Commonwealth
to do so), and voting, see, e.g., U.S. Const. amend. XXVI, § 1
("The right of citizens of the United States, who are eighteen
years of age or older, to vote shall not be denied or abridged by
the United States or by any State on account of age.").  Simply
attaining the age of eighteen, however, does not carry with it
the concomitant right to keep and bear arms.  For one thing, the

---

legislative designation of an age of majority simply endows those who have reached that age with "a status, not a fixed or vested right." National Rifle Ass'n, 700 F.3d at 204 n.17 (quoting Jeffrey F. Ghent, Statutory Change of Age of Majority as Affecting Pre-Existing Status or Rights, 75 A.L.R.3d 228, § 3 (1977)) (internal quotation marks omitted).  The shifting age of majority in the United States exemplifies this concept: until the 1970s, most states considered individuals under the age of twenty-one as "minors" in the eyes of the law.  See Barnett, supra, at 681-86 app.  Moreover, a decrease in the age of majority does not automatically assign all preexisting rights and responsibilities to the individuals at or above the newly applicable age of majority.  See, e.g., Mass. Gen. Laws ch. 138, § 34 (pegging the legal age for alcohol consumption in the Commonwealth at twenty-one); Estes v. State, 232 Ga. 703, 707-08 (1974) (holding that a statutory enactment lowering the age of majority from twenty-one to eighteen did not render unconstitutional the exclusion of eighteen- to twenty-year-olds from grand juries in Georgia).  The Supreme Court has made clear time and time again that it is the prerogative of state legislatures to establish the age of majority in their respective jurisdictions, so long as such decisions do not ride roughshod over the Constitution.  See, e.g., Craig v. Boren, 429 U.S. 190, 199-200 (1976) (declaring an Oklahoma law forbidding the sale of nonintoxicating beer to males under the age of twenty-one and females under the age of eighteen to be violative of the Equal Protection Clause because myriad statistical surveys did not support such differential, gender-based treatment); Stanton v. Stanton, 421 U.S. 7, 17-18 (1975) (deeming a Utah child-support statute setting the age of majority for males at twenty-one and the age of majority for females at eighteen a violation of the Equal Protection Clause); Oregon v. Mitchell, 400 U.S. 112, 124-31 (1970) (plurality opinion) (holding, prior to the passage of the Twenty-Sixth Amendment, that an amendment to the Voting Rights Act lowering the voting age in state and local elections from twenty-one to eighteen exceeded the bounds of congressional authority because "the Constitution was . . . intended to preserve to the States the power that even the Colonies had to establish and maintain their own separate and independent governments, except insofar as the Constitution itself commands otherwise," id. at 124), superseded by constitutional amendment, U.S. Const. amend. XXVI.

Third, Powell complains that, because Massachusetts General Laws chapter 140, section 131(d)(iv) prohibits eighteen- to twenty-year-olds from receiving a license to carry a firearm, it constitutes a blanket ban on gun ownership for an entire class of

### ii.   Means-End Scrutiny

Despite concluding that the age-based limitation on licenses

persons.  <u>See</u> Pet'r's Mem. 32.  A revisitation of <u>Heller</u> proves
the absuridty of this allegation.  In <u>Heller</u>, the Supreme Court
found the law under consideration unconstitutional because it
"totally ban[ned] handgun possession in the home . . . [and]
require[d] that any lawful firearm in the home be disassembled or
bound by a trigger lock at all times."  554 U.S. at 628.
Conversely, the particular age-based regulation at issue here is
not nearly as pernicious, given that persons wishing to attain a
license to carry in the Commonwealth are subject to the
limitation inscribed in Massachusetts General Laws chapter 140,
section 131(d)(iv) only until the age of twenty-one.  <u>Cf.</u>
<u>National Rifle Ass'n</u>, 700 F.3d at 207 (holding that a federal
firearms regulation limiting the sale of firearms by federally
licensed firearms dealers to individuals twenty-one years of age
or older was constitutionally permissible because, <u>inter alia</u>,
"[a]ny 18-to-20-year-old subject to the ban will soon grow up and
out of its reach" and "[t]he temporary nature of the burden
reduces its severity").  Though the First Circuit has not yet
spoken to whether the requirement that an individual be twenty-
one years of age to obtain a license to carry amounts to a
blanket ban, the logic of its decision in <u>United States</u> v. <u>Rene</u>
<u>E.</u>, 583 F.3d 8, suggests not.  In <u>Rene E.</u>, a seventeen-year-old
challenged his conviction under a federal law that makes it a
crime for juveniles to knowingly possess a handgun.  <u>Id.</u> at 10.
The juvenile advanced an argument, among others, that the ban on
juvenile handgun possession was akin to the firearms ban in
<u>Heller</u> but that it was "even more complete, because it applie[d]
at all times, under all circumstances."  <u>Id.</u> at 12 (internal
quotation marks omitted).  A unanimous panel upheld the juvenile
conviction, and in so doing, impliedly rejected this contention.
<u>See id.</u> at 12, 16.

Finally, Powell argues that the twenty-one-and-over
limitation in Massachusetts General Laws chapter 140, section
131(d)(iv) is invalid because it was first introduced in 1998,
Pet'r's Mem. 37, which is far too recent for the statute to
qualify as one of the "<u>longstanding</u> prohibitions on the
possession of firearms" that the <u>Heller</u> Court regarded as
presumptively valid.  554 U.S. at 626 (emphasis added).  For the
reasons mentioned above and below, <u>see</u> <u>supra</u> section II.D.2.a.i;
<u>infra</u> section II.D.2.a.ii, this argument too fails.

to carry to adults twenty-one years of age or older does not unduly burden Powell's right to keep and bear arms, this Court, in the interest of prudence, nonetheless proceeds to assess whether Massachusetts General Laws chapter 140, section 131(d)(iv) passes constitutional scrutiny.

Although the <u>Heller</u> Court foreclosed the use of either rational basis scrutiny or interest-balancing in the analysis of firearms regulations, 554 U.S. at 628 n.27, 634-35, it declined to establish a reliable standard for the lower courts to follow. The First Circuit has set out its own standard and, in line with the majority of its sister circuits, views challenged firearms regulations through the lens of intermediate scrutiny. <u>See</u> <u>United States</u> v. <u>Booker</u>, 644 F.3d 12, 25 (1st Cir. 2011) (holding that "a categorical ban on gun ownership by a class of individuals must be supported by some form of 'strong showing,' necessitating a substantial relationship between the restriction and an important governmental objective" (quoting <u>United States</u> v. <u>Skoien</u>, 614 F.3d 638, 641 (7th Cir. 2010) (en banc)); <u>see also</u> <u>National Rifle Ass'n</u>, 700 F.3d at 194; <u>Marzzarella</u>, 614 F.3d at 97; <u>Heller</u>, 670 F.3d at 1257; <u>Chester</u>, 628 F.3d at 683; <u>Reese</u>, 627 F.3d at 802; <u>United States</u> v. <u>Williams</u>, 616 F.3d 685, 692-93 (7th Cir. 2010).  To satisfy this standard, the government must demonstrate that the challenged law "serve[s] important governmental objectives" and is "substantially related to the

47

achievement of those objectives." <u>Craig</u> v. <u>Boren</u>, 429 U.S. 190, 197 (1976).

Generally, courts look to the legislative history antecedent to a bill's passage to glean the legislative intent behind the bill's enactment.  <u>See</u> <u>McGuire</u> v. <u>Reilly</u>, 260 F.3d 36, 48-49 (1st Cir. 2001) (examining legislative history in an intermediate-scrutiny analysis).  Identifying the meaning behind a Massachusetts bill's enactment, however, proves rather difficult. Admittedly, the proceedings of the General Court of the Commonwealth of Massachusetts[19] ("General Court") are made publicly available via the Journals of the Massachusetts Senate and House of Representatives, videotape recordings of legislative hearings and sessions, and a host of other sources.  <u>See</u> State Library of Mass., <u>Massachusetts Legislative History</u> § 1.10.2, at 15-18 (2002), <u>available at</u> http://archives.lib.state.ma.us/ bitstream/handle/2452/35648/massachusettslegislativehistory.doc. In addition, the Joint Rules of the Senate and House of Representative allow members of the General Court to append to any bill a statement of intent, Temporary Joint Rule of the Senate and House of Representatives 13, <u>available at</u> http://www .malegislature.gov/People/ClerksOffice/Joint/Rules, and on rare occasions, bills are introduced by preambles setting out the

---

[19] The General Court of the Commonwealth of Massachusetts is the formal name given to the Commonwealth's highest legislative body.

purpose of enactment, see, e.g., Act of July 17, 1972, ch. 766, §
1, 1972 Mass. Acts 692, 692 (expressly articulating the aim of an
act that pertained to the regulation of and funding for special
education services in the Commonwealth).  Nevertheless, more
often than not, bills are passed by the General Court and signed
into law by the governor with nary a mention of the reasons
informing the particular legislative action taken.  See State
Library of Mass., supra, § 1.2.1, at 3; id. § 1.10, at 13.  Such
was the case with the statute at issue here.

That said, the customary absence of deliberative or
motivational impressions from Massachusetts legislation does not
automatically render void all laws enacted by the General Court;
rather, courts are permitted to reach beyond legislative history
and probe other relevant materials -- including earlier
iterations of a statute's text and even rigorous empirical data
-- to divine legislative intent.  See, e.g., Barnes v. Glen
Theatre, Inc., 501 U.S. 560, 567-72 (1991) (noting that the
purpose of a public indecency statute enacted by a state
legislature that did not memorialize its goings-on in the
ordinary course of legislative business was nevertheless "clear
from [the statute's] text and history," id. at 568); Maryland v.
Craig, 497 U.S. 836, 851-57 (1990) (sifting through state laws,
government reports, and academic literature, in addition to
legislative history, to determine that a Maryland statutory

procedure preventing a child witness in a child abuse case from testifying against a defendant in the defendant's physical presence was substantially related to an important governmental objective).  As a result, in order to determine whether Massachusetts General Laws chapter 140, section 131(d)(iv) satisfies intermediate scrutiny, this Court must undertake a review of these supplementary sources.

Massachusetts General Laws chapter 140, section 131 finds its origins in a piece of 1906 legislation informally titled "An Act to Regulate by License the Carrying of Concealed Weapons," which reads, in relevant part, as the following:

> The justice of a court, or trial justices, the board of police or mayor of a city, or the selectmen of a town, or persons authorized by them, respectively, may, upon the application of any person, issue a license to such person to carry a loaded pistol or revolver in this Commonwealth, if it appears that the applicant has good reason to fear an injury to his person or property, and that he is a suitable person to be so licensed.

Act of Mar. 16, 1906, ch. 172, § 1, 1906 Mass. Acts 150, 150. Although it was drafted in fairly broad terms, the Act clearly set forth two prerequisites to obtaining a license to carry firearms in the Commonwealth, the most relevant of which required applicants to be "suitable person[s] to be so licensed." Id. (emphasis added).  While the Act failed to list with specificity the traits that would qualify a person to be "suitable" to carry firearms, the use of such a word suggests that the General Court

may in fact have been informed by a desire to keep potentially dangerous weapons out of reckless hands.[20]  Cf. National Rifle Ass'n, 700 F.3d at 201 (surmising that, during the Founding Era, "categorical restrictions [on gun ownership] may have been animated by a classical republican notion that only those with adequate civic 'virtue' could claim the right to arms"); Pineiro v. Gemme, No. 10-40262-FDS, 2011 WL 4853019, at *6 (D. Mass. Oct. 12, 2011) (Saylor, J.) (commenting that "no substantial uncertainty exists over the meaning of the term 'suitable person'" found within the modern version of Massachusetts General Laws chapter 140, section 131, id., and that "[t]he statute's essential purpose has been described as 'to limit access to deadly weapons by irresponsible persons,'" id. (quoting Ruggiero v. Police Comm'r of Bos., 18 Mass. App. Ct. 256, 258 (1984))).

In 1925, the General Court clarified and further limited the classes of persons to whom a license to carry may be granted, see Act of Apr. 29, 1925, ch. 284, sec. 4, § 131, 1925 Mass. Acts 323, 324 (prohibiting the issuance of a license to carry to, inter alia, "[any] unnaturalized person, [and] [any] person who

---

[20] Just five years after its enactment, the Act was modified slightly, with only the word "loaded" stricken from the existing text.  See Act of June 14, 1911, ch. 548, sec. 1, § 1, 1911 Mass. Acts 568, 568.  Though hardly constituting a change in form, this minor amendment marked a notable change in substance, as it illuminated what appears to have been the General Court's desire to eliminate the largely meaningless distinction between firearms that were immediately dischargeable and those that were not.

has been convicted of a felony or of the unlawful use or sale of drugs"), adopting for the first time an age-based restriction that proscribed "[any] minor other than one fifteen years of age or over in the employ of a bank, public utility corporation or business of a similar nature whose application is endorsed by his employer" from receiving a license to carry, <u>id.</u>  The General Court raised the minimum restricted age to eighteen in 1957 and did away with the earlier business associational requirement. <u>See</u> Act of Aug. 21, 1957, ch. 688, sec. 15, § 131, 1957 Mass. Acts 596, 602.  Interestingly, though, the General Court still did not assign to eighteen-year-olds an unfettered right to carry firearms, as it allowed licensure only for "minor[s] eighteen or over who ha[d] the written consent of [a] parent or guardian." <u>Id.</u>

The amendments of 1998 -- known collectively and colloquially as the Gun Control Act of 1998 ("Gun Control Act") -- were part of a larger effort to overhaul the existing firearms regulatory regime and were described by contemporaneous sources as implementing some of the most stringent gun laws in the nation at that time.  <u>See, e.g.</u>, Hillary Chabot, <u>Gun Law Gets a Bit Tougher Today</u>, Bos. Globe, Oct. 21, 1998, at B4.  Among the many changes made was an elevation in the age of licensure for the carrying of firearms from eighteen to twenty-one.  Act of July 23, 1998, ch. 180, sec. 41, § 131(d)(iv), 1998 Mass. Acts 357,

375 (codified at Mass. Gen. Laws ch. 140, § 131(d)(iv)).  But the
twenty-one-and-over restriction pertaining to the license to
carry was not the only such limitation introduced by the Gun
Control Act.  Indeed, the General Court included within the Act
provisions banning the sale of large-capacity rifles, shotguns,
firearms, and feeding devices, as well as the sale of any
ammunition or ammunition feeding devices, to individuals under
the age of twenty-one.  Id. sec. 45, § 131E(a)-(b), at 381-82
(codified at Mass. Gen. Laws ch. 140, § 131E(a)-(b)).  The
breadth of regulatory change attending the passage of the Gun
Control Act, as well as the introduction and progressive raising
of age-based restrictions over the course of the past century,
provides sufficient evidence that the General Court sought to
achieve an important governmental objective -- namely, the
assurance of public safety.[21]

Collected data on national gun violence across age groups
only further substantiate this inference and demonstrate that the
age-based restriction at issue here is substantially related to
the achievement of the General Court's aforementioned objective.
A 1999 report produced jointly by the Departments of Justice and

---

[21] Certain members of the academy, however, find dubious the
notion that a public-safety rationale can form the basis for
prohibiting eighteen- to twenty-year-olds from possessing
firearms.  See Eugene Volokh, Implementing the Right to Keep and
Bear Arms for Self-Defense: An Analytical Framework and a
Research Agenda, 56 UCLA L. Rev. 1443, 1511-13 (2009).

the Treasury found that 24% of all gun homicides that took place
in 1997 were committed by eighteen- to twenty-year-olds and that,
among individuals ages ten through eighty, "18, 19 and 20 year
olds ranked first, second, and third in the number of gun
homicides committed" that same year.  U.S. Dep't of the Treasury
& U.S. Dep't of Justice, Gun Crime in the Age Group 18-20, at 2
(1999), available at http://permanent.access.gpo.gov/lps20136
/report.pdf; see also id. at 8 fig.1.  The report further stated
that nearly three-quarters of the homicides committed by people
between the ages of eighteen and twenty involved the use of
firearms.  Id. at 2.  These statistics were in line with a
decade-long trend of climbing gun use within the nation's young
adult population.  Id.

    In addition, a recent study conducted by the Department of
Justice, the Federal Bureau of Investigation, and the Criminal
Justice Information Services Division confirms that young adults
between the ages of eighteen and twenty make up a
disproportionate share of those arrested for gun-related and
violent offenses.  See U.S. Dep't of Justice et al., Crime in the
United States 2011 tbl.38 (2011), available at http://www.fbi.gov
/about-us/cjis/ucr/crime-in-the-u.s/2011/crime-in-the-u.s.-2011/
tables/table-38.  To wit, in 2011, eighteen- to twenty-year-olds
accounted for approximately 16.6% of all arrests made for weapons
offenses (including those pertaining to the unlawful possession

54

and carrying of firearms).  See id.  People in this age group
also comprised about 18.2%, 13.2%, 22.6%, 10.5% and 9.6% of all
arrests made for murder and nonnegligent manslaughter, forcible
rape, robbery, aggravated assault, and all other types of
assault, respectively.[22]  See id.  These figures are particularly
notable, given that only about 4.3% of the national population
count themselves among this narrow age demographic.[23]  See U.S.
Census Bureau, Statistical Abstract of the United States: 2012,
at 14 tbl.11 (2012), available at http://www.census.gov/prod
/2011pubs/12statab/pop.pdf.  Although this Court recognizes the
inherent danger of drawing causal connections between rates of
arrest and incidences of criminal activity, the data mined in
this analysis at the very least give credence to the notions that
young adults' access to firearms is an issue of significant
governmental concern and that there is a close fit between this
concern and the prohibition on the grant of licenses to carry to
adults under the age of twenty-one.

---

[22] This Court acknowledges the likelihood that not all of
these crimes were committed with firearms.  In fact, in 2009,
only 22% of all violent incidents involved weapons at all.
Bureau of Justice Statistics, U.S. Dep't of Justice, Criminal
Victimization, 2009, at 8 tbl.9. (2010), available at http://bjs
.ojp.usdoj.gov/content/pub/pdf/cv09.pdf.  That said, of the
crimes that were committed with weapons, more than 36% of them
involved a firearm, which makes it the most popular instrument
among weapon-toting violent criminals.  See id.

[23] The population figures used to calculate this statistic
come from 2009, not from 2011.

Accordingly, this Court holds that the prohibition on
eighteen- to twenty-year-olds found within Massachusetts General
Laws chapter 140, section 131(d)(iv) aligns with the letter and
spirit of the Second Amendment and passes intermediate scrutiny.

## b.   Equal Protection

Age is not considered a trait worthy of suspect
classification under the Equal Protection Clause of the
Fourteenth Amendment.  Kimel v. Fla. Bd. of Regents, 528 U.S. 62,
83 (2000).  As a consequence, "[s]tates may discriminate on the
basis of age without offending the Fourteenth Amendment if the
age classification in question is rationally related to a
legitimate state interest."  Id.  A statute that makes
distinctions among individuals on the basis of age is presumed to
be rationally enacted, so "the individual challenging its
constitutionality bears the burden of proving that the facts on
which the classification is apparently based could not reasonably
be conceived to be true by the governmental decisionmaker."  Id.
at 84 (quoting Vance v. Bradley, 440 U.S. 93, 111 (1979))
(internal quotation marks omitted).

Powell has submitted no evidence to suggest that
Massachusetts General Laws chapter 140, section 131(d)(iv) was
the product of irrational whim, so he has failed to carry the
burden required of him under existing Supreme Court law.  Because
this Court has already deemed the statute permissible under

56

intermediate scrutiny, <u>see</u> <u>supra</u> section II.D.2.a.ii, by implication, it naturally passes the exceedingly low threshold of rational basis scrutiny.

### III. CONCLUSION

For the foregoing reasons, Powell's petition for a writ of habeas corpus, ECF No. 1, is DENIED.

**SO ORDERED.**

<u>/s/William G. Young</u>
WILLIAM G. YOUNG
DISTRICT JUDGE